**EXPEDITIONS UNLIMITED AQUATIC ENTERPRISES, INC., a corporation, Appellant, Norman Scott,**

v.

**SMITHSONIAN INSTITUTION et al.**

**No. 74–1899.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Dec. 16, 1976.

Decided Sept. 16, 1977.

---

**31.** See note 13 *supra.*

John J. Pyne, Washington, D.C., for appellant.

Robert E. Kopp, Atty., Dept. of Justice, Washington, D.C., for appellees. Earl J. Silbert, U. S. Atty., John A. Terry and Jeffrey T. Demerath, Asst. U. S. Attys., and Suzanne D. Murphy, Asst. Gen. Counsel, Smithsonian Institution, Washington, D.C., were on the brief. Barbara L. Herwig, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

Concurring opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, with whom J. SKELLY WRIGHT, Circuit Judge, joins.

Concurring (dubitante) opinion filed by WILKEY, Circuit Judge.

LEVENTHAL, Circuit Judge:

This opinion considers the issue of the conflict between the public interest in shielding responsible government officials against the harassment of vindictive or ill-founded law suits and the interest of those whose reputations may have been injured by statements of government officials. In *Barr v. Matteo*,[1] the Supreme Court struck the balance in favor of the officials. We do not view that 1959 ruling as undercut by later decisions, and adhere to it.

■ Plaintiff, Expeditions Unlimited, brought an action for libel against Clifford Evans, Chairman of the Department of Anthropology at the Smithsonian Institution's Museum of Natural History, and against the Smithsonian Institution. The action is based on a letter by Evans in which he was critical of plaintiff's capabilities in the field of underwater archaeological excavation. The district court granted summary judgment for defendant Smithsonian Institution on governmental immunity grounds.[2] The district court granted summary judgment for defendant Evans on the grounds of his absolute privilege in making statements within the scope of his duties as a government employee. We remand for further exploration of the issue whether Evans was acting within the ambit of his employment.[3] However, we agree with the district court that if Evans was acting within the ambit of his discretion, he would have absolute immunity. We do not reinstate the view in the panel opinion that there might be only a qualified privilege. We now state our reasons.

It was the fear of chilling legitimate official conduct that motivated the Supreme Court's decision in the seminal case of *Barr v. Matteo, supra. Barr* also involved an action for defamation. There, the Acting Director of the Office of Rent Stabilization, a federal agency, was sued by another government employee who claimed that the Acting Director had maliciously issued a press release injurious to the employee's reputation. The Court held that once it had been established that the action taken "was within the outer perimeter of [his] line of duty," the Acting Director was entitled to absolute immunity against liability in damages even though his action was a discretionary exercise and was allegedly prompted by malice. 360 U.S. at 575, 79 S.Ct. at 1341. Justice Harlan[4] reasoned that an absolute privilege was required because

1. 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

2. That judgment was affirmed by the panel for the reasons stated in Judge Wilkey's opinion. After ordering sua sponte that the issue of the Smithsonian's immunity would be decided without oral argument under Rule 11(e), the en banc court chose not to consider the matter. The portion of the panel opinion dealing with the Smithsonian is therefore reinstated as the opinion of the panel and for convenience is reprinted in the appendix.

As to the immunity defense raised by the individual defendant Evans, the panel opinion, Judge Leventhal dissenting, ordered a remand to the district court to determine whether the case was appropriate for absolute immunity or qualified immunity. It contemplated an individualized inquiry into whether the added benefits derived from the award of absolute immunity to the official outweighed the loss of litigant rights. It set out a number of factors for the district court to consider, including the nature of the litigant's interest, the expected impact of the differing immunities on the performance of the official's duty and the govern-mental as opposed to private character of that duty.

3. Although Evans' responsibilities included responding to information inquiries from foreign governments in his field, the record does not elucidate whether official replies had to be channelled in a certain manner, whether Smithsonian officials respond to personal inquiries in their official capacity, and if the letter was a personal letter whether it is considered proper for several officials to comment independently on foreign queries. These considerations are relevant to the determination of whether Evans acted within the perimeter of his responsibilities or whether, as plaintiff claims, he was acting in a personal capacity.

4. While only three other justices concurred in Justice Harlan's opinion, his views on the doctrine of absolute immunity did command a majority of the Court. Justice Stewart dissented only because he felt that under the particular facts of *Barr*, the official was acting beyond the outer perimeter of his duties. 360 U.S. at 592, 79 S.Ct. 1335. See also *Howard v. Lyons*, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959).

. . . officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

360 U.S. at 571, 79 S.Ct. at 1339.

■■■■ The federal common law rule of absolute immunity of officials sued for defamation furthers the goal of effective administration of government in the public interest.[5] A qualified immunity would be dependent upon a myriad of factors and a particularistic assessment of the facts of each case,[6] leaving an official at hazard to anticipate whether or not he is protected. "An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon circumstances and motivations of his actions, as established by the evidence at trial." *Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976). Even the need to find the time and money for a defense[7] would have a chilling, if not paralyzing, effect on an official's willingness to speak out, in the exercise of his discretion, to further the public interest.

At the time we granted rehearing en banc we were aware of *Economou v. U.S. Department of Agriculture*, 535 F.2d 688 (2nd Cir. 1976).[8] We disagree with *Economou*, and view it, indeed, as illustrating the dangers of a doctrine providing only qualified immunity. There, an administrative complaint and accompanying press release of the Department of Agriculture had alleged, on the basis of an audit, that Economou had failed to maintain the minimum prescribed capital balance required for a registered futures commission merchant. An administrative law judge issued a decision finding a violation. While the administrative proceeding was pending on appeal, Economou, alleging defamation and wrongful institution of administrative proceedings, sued various officials of the Department of Agriculture, including the administrative law judge, for $32 million in damages.

As the *Economou* court recognized, if *Barr* had governed its decision, its inquiry would have stopped if "the alleged conduct of the defendants . . . was 'within the outer perimeter of their authority' and involved the exercise of discretion." 535 F.2d at 691. Instead, the court, rejecting *Barr*, held that only a qualified "good faith"

5. The need to determine whether an official is acting within the outer perimeter of his duties will not defeat the purpose of absolute immunity. For example, on the facts of this case, the determination of whether Evans was acting within the scope of his employment may be made on the basis of affidavits from his superiors elucidating his duties and the procedures usually followed in answering queries from foreign governments. This type of limited inquiry may typically be dealt with on a motion for summary judgment. Even at trial the issue is for the court. The official knows the scope of his discretion. The possibility of such an inquiry is unlikely to deter any official in the vigorous pursuit of his responsibilities.

6. In *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), which held that *state* executive officers sued under 42 U.S.C. § 1983 were only entitled to a qualified immunity, the Supreme Court explained that the limited privilege was dependent upon "the existence of reasonable grounds for belief formed at the time and in light of all the circumstances, coupled with good faith belief . . . ."

416 U.S. at 247–248, 94 S.Ct. at 1692.

7. Although government counsel now often defend even personal actions against federal officers arising out of their official duties, they are not required to do so. *See, e. g.,* 28 U.S.C. § 517 (1970):

The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.

8. Subsequent to the oral argument en banc in December, 1976, the Supreme Court granted certiorari, *sub nom Butz v. Economou*, 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534 (1977).

immunity was applicable, and remanded the case for further proceedings.

This rejection of *Barr* can only exacerbate an already serious problem of modern government—the tendency of bureaucrats to sit tight rather than take action likely to rile the individuals or groups being regulated. The nation's welfare is dependent upon officials who are willing to speak forthrightly and disclose violations of the law and other activities contrary to the public interest.[9] Their voices will be stilled if they perceive or fear that the person involved has the resources or disposition to defend with all affirmative tactics. When millions may turn on regulatory decisions, there is a strong incentive to counter-attack.

In *Economou*, the Second Circuit suggested that *Barr* had been undermined by the Supreme Court's decisions in cases arising under 42 U.S.C. § 1983. We disagree.[10] The Supreme Court decisions in § 1983 cases do not overrule *Barr*. They rather establish the rule for cases where fundamental, constitutional rights are involved, and declare that ordinary rules of official immunity must yield when the executive is charged with exercising his special power as a government official in a way prohibited by the Constitution. In *Scheuer v. Rhodes*,[11] far from undercutting *Barr*, Chief Justice Burger cited *Barr* and its antecedent, *Spalding v. Vilas*,[12] as cases illuminating the inherent necessity of providing broad protection to executive discretionary acts in the context of defamation actions. He noted, however, that *Barr* and *Spalding* arose "in a context other than a § 1983 suit" (at 247, 94 S.Ct. at 1692.). The absolute immunity those cases granted to federal executive officials was not extended to state officials sued under § 1983; they could claim only qualified immunity. Chief Justice Burger's opinion makes the reason clear: Since § 1983 gives an action against state officials when constitutional violations are invoked, it is patently inconsistent with that federal statutory action to apply a federal common law rule of absolute immunity for executive officials subjected to suit by the statute.[13] While § 1983 retains the

---

9. *See Federal Trade Commission v. Cinderella Career and Finishing Schools, Inc.*, 131 U.S. App.D.C. 331, 404 F.2d 1308 (1968), where this court, in a situation not unlike that in *Economou*, refused to enjoin the Federal Trade Commission's issuance of a press release about a proceeding for unfair trade practices, even though we recognized that the petitioner might prevail before the administrative agency and would then be unable to remedy the injury caused by the adverse publicity. Our decision was based on the fact that the FTC could only achieve its goal of protecting the consumer by informing him of the actions it was taking in his behalf. 131 U.S.App.D.C. at 337, 404 F.2d at 1314.

10. For decisions of other circuits citing *Barr* with approval, see, *e. g.*, *Williams v. Gorton*, 529 F.2d 668, 672 (9th Cir. 1976); *Mandel v. Nouse*, 509 F.2d 1031, 1033 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2630, 45 L.Ed.2d 671 (1975).

11. 416 U.S. 232, 246–247, 94 S.Ct. 1683 (1974).

12. 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896). *Spalding* held that the head of an executive department has absolute immunity for special communications made by him pursuant to an act of Congress for matters within his authority.

13. *See Scheuer v. Rhodes*, 416 U.S. at 243, 94 S.Ct. at 1690:

> Final resolution of [the scope of qualified immunity] must take into account the functions and responsibilities of these particular defendants in their capacities as officers of the state government, as well as the purposes of 42 U.S.C. § 1983. In neither of these inquiries do we write on a clean slate. It can hardly be argued, at this late date, that under no circumstances can the officers of state government be subject to liability under this statute. In *Monroe v. Pape*, [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492] Mr. Justice Douglas, writing for the Court, held that the section in question was meant "to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." . . . Through the Civil Rights statutes, Congress intended "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." . . .
>
> Since the statute relied on thus included within its scope the " '[m]isuse of power, possessed by virtue of a state law and made possible only because the wrongdoer is clothed with the authority of state law,' " *id.*, at 184, [81 S.Ct. 473] (quoting *United States v. Classic*, 313 U.S. 299, 326 [61 S.Ct. 1031,

absolute immunity of officials exercising power within the judicial or quasi-judicial ambit,[14] the plain provision for suits against officials in the executive branch precludes an absolute immunity defense.

Our decision in *Apton v. Wilson*, 165 U.S. App.D.C. 22, 506 F.2d 83 (1974), extended the *Scheuer* rule of qualified immunity in § 1983 cases to an action against federal officials that involved one of our "most cherished liberties," the freedom from arbitrary arrest and detention. 165 U.S.App. D.C. at 32, 506 F.2d at 93.

■ The defamation action in the case at bar involves damage to business reputation—an interest of no greater weight than the interest in personal reputation involved in *Barr*. While damage to reputation is not inconsequential, and can, under some circumstances, qualify for procedural protection under the due process clause,[15] it is not as basic to a free society as the Fourth Amendment right to be free from arbitrary search and seizure of person or property, a right so precious that a remedy in damages has been inferred from the Constitution itself. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Nor is *Barr* undercut by *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). That was essentially a case involving legislative immunity, under the speech or debate clause, and the Court remanded for a determination of the extent of legisla-

tive immunity. *Doe* involved a suit by parents for invasion of privacy from the dissemination of a congressional report that identified students in derogatory contexts. The ruling as to the Public Printer and the Superintendent of Documents was only that they did not have an absolute immunity greater than the immunity of the legislators who tendered the documents for printing. The Court held that although they acted "within the outer perimeter" of their statutory duties in printing what was tendered, they had no "independent immunity." 412 U.S. at 322–23, 93 S.Ct. 2018. The Court's decision was responsive to the character of the Government Printing Office, which acts as a service organization for the three branches of government. 412 U.S. at 322, 93 S.Ct. 2018. The Court concluded that for purposes of the judicially-fashioned doctrine of immunity, the officials of the Printing Office were immune from the suit only to the extent that they were acting within the "sphere of legitimate legislative activity." 412 U.S. at 324, 93 S.Ct. 2018.

■ *Barr* premises that it is better to leave unredressed some defamations[16] by officers acting out of malice or excess zeal, than to subject the conscientious to the constant dread of retaliation. For every case of malicious governmental action potentially remedied by replacing *Barr* with a qualified immunity, hundreds if not thousands of other actions in the public interest may be deferred or omitted. There is too

---

85 L.Ed. 1366] (1941)), government officials, as a class, could not be totally exempt, by virtue of some absolute immunity, from liability from its terms. Indeed, as the Court also indicated in *Monroe v. Pape, supra*, the legislative history indicates that there is no absolute immunity.

14. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

15. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). *But see Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

16. Under certain circumstances, declaratory and injunctive relief may be obtained against defamatory statements by government officials. For example, in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), the Supreme Court held it was possible for several organizations which claimed they had been defamed to obtain declaratory and injunctive relief to strike their names from the Attorney General's list of subversive organizations. 341 U.S. at 139–40, 71 S.Ct. 624. The availability of this equitable relief is consistent with the rationale of *Barr* since it does not involve the personal liability of an official, and is therefore unlikely to deter him in the vigorous pursuance of his duties. *B. C. Morton International Corporation v. Federal Deposit Insurance Corporation*, 305 F.2d 692, 695–96 (1st Cir. 1962).

much to be said for the *Barr* choice, there was too much hard work and hard thought when the problem was faced squarely by great judges like John Harlan and Learned Hand, to sweep it aside as the detritus of a doctrine that has been nibbled away *sub silentio.*

The judgment in favor of defendant Smithsonian Institution is affirmed. The judgment in favor of defendant Evans is remanded for limited inquiry whether his letter was within the outer perimeter of his duties.

*So ordered.*

A–1

APPENDIX

The part of the panel opinion in this case dealing with the Smithsonian Institution is reinstated as the opinion of the panel. Majority op. at p. —— of 184 U.S.App.D.C., n. 2, p. 291 of 566 F.2d. It is reprinted here for convenience.

No. 74–1899

EXPEDITIONS UNLIMITED AQUATIC ENTERPRISES, INC.,
A CORPORATION, APPELLANT
NORMAN SCOTT

*v.*

SMITHSONIAN INSTITUTION, ET AL.

Appeal from the United States District Court
for the District of Columbia

(D.C. Civil Action 54–71)

Argued 18 September 1975

Decided 28 June 1976

*John J. Pyne,* for appellant.

*Jeffrey T. Demerath,* Assistant United States Attorney, with whom *Earl J. Silbert,* United States Attorney and *John A. Terry* and *Suzanne D. Murphy,* Assistant United States Attorneys, were on the brief for appellee.

Before LEVENTHAL and WILKEY, Circuit Judges and SOLOMON,* United States Senior District Judge for the District of Oregon.

WILKEY, Circuit Judge:

This case comes before us on appeal from an order of summary judgment entered 31 July 1974,[1] in an action for libel brought by petitioners against the Smithsonian Institution and its Regents, and against Clifford Evans, Chairman of the Department of Anthropology at the Museum of Natural History. The claim arose out of a letter written by Evans, in which he expressed views as to the capabilities of petitioner Expeditions Unlimited in the field of underwater archaeological excavation. The merits of the libel claim are not presently before us,

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. App. at 6–8.

since summary judgment for defendants was granted on the grounds of Smithsonian's governmental immunity and Evans' absolute privilege in making statements within the scope of his duties as a government employee.

## IMMUNITY OF THE SMITHSONIAN INSTITUTION

The holding of the district court that the Smithsonian Institution may not be sued for libel is affirmed. That conclusion rests upon our reading of the Federal Tort Claims Act. Because we find that the Tort Claims Act should be read as granting federal agencies immunity from suit for libel, we do not reach the issue of the Institution's immunity status at common law.

In finding immunity under the Act, the initial step is to determine whether the defendant organization is a "federal agency" within the definition set forth in the statute.[2] Although the Smithsonian has a substantial private dimension,[3] we conclude that the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding[4] and oversight,[5] make the institution an "independent establishment of the United States," within the "federal agency" definition.[6]

Section 1346(b) of Title 28, U.S.C., creates subject to the provisions of 28 U.S.C. §§ 2671–80, a remedy against the United States for injuries wrongfully caused by any "employee of the government."[7] Because the Smithsonian is a federal agency, its employees are "employee[s] of the government," and the § 1346(b) action thus may lie.[8] Under 28 U.S.C. § 2679(a), the § 1346(b) remedy is made exclusive in cases where that section applies, even where an agency may elsewhere be authorized to sue and be sued in its own right.[9] However, under 28 U.S.C. § 2680(h), the provisions of the Tort Claims Act, including the jurisdictional provision, § 1346(b), are made inapplicable to libel actions, such as the one

---

**2.** 28 U.S.C. § 2671. Definitions

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

\* \* \* \* \* \*

**3.** The Smithsonian has private endowment funds which in 1970 totalled $33 million. *General Hearings Before the Sub-Committee on Library and Memorials*, 91st Cong., 2d Sess., 323 (1970) (hereinafter *Hearings*). In that year over $15 million of private money went toward operations of the Institution, and almost one-third of the employees were non-federal. *Id.* at 253.

**4.** Approximately 75% of the Institution's operating funds come from federal appropriations. *Hearings, supra* note 3, at 253, 321.

**5.** Eight of the seventeen Regents of the Institution acquire their positions by virtue of holding other high positions in the federal government. 20 U.S.C. § 42 (1970). The remaining Regents are appointed by joint resolution of Congress. 20 U.S.C. § 43 (1970). The Institution is audited periodically by the General Accounting Office. *See Hearings, supra* note 3, at 362–97.

**6.** 28 U.S.C. § 2671 (1970). While there is no outstanding stock of the Smithsonian, it has more in common with the "mixed ownership government corporations," 31 U.S.C. § 856 (1970), like the F.D.I.C., which have been found to be "federal agencies," *Davis v. F.D.I.C.*, 369 F.Supp. 277, 279 (D.Colo.1974); *Freeling v. F.D.I.C.*, 221 F.Supp. 955, 955–56, (W.D.Okla. 1962), than with corporations whose only significant governmental contact is a federal charter. *Pearl v. United States*, 230 F.2d 243, 245 (10th Cir. 1956) (Civil Air Patrol held not a federal agency). The substantial federal funding and the important supervisory role played by governmental officials are the most important factors linking it to the government. *Cf. United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973).

**7.** 28 U.S.C. § 1346(b) (1970).

**8.** 28 U.S.C. § 2671 (1970).

**9.** 28 U.S.C. § 2679. Exclusiveness of remedy

(a) The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

presently before us.[10] The difficult interpretive problem posed by this case is to determine the effect of this exceptions clause.

On the one hand, the exceptions clause might be viewed as making the Tort Claims Act entirely inapplicable to libel actions, in which event the common law immunity status of a defendant would govern, and an action might be possible if independent jurisdictional grounds could be found. On the other hand, § 2680(h) could be seen as imposing a bar to suit, if the Tort Claims Act is regarded as a systematic statute governing all tort claims, with the exceptions clauses setting forth the areas where suit is to be barred.

There are significant arguments to be made in favor of the first view. The language of the exceptions section makes no reference to any creation or, more properly, continuation of long established governmental immunity in the categories of cases it sets forth. Rather, the exceptions section only states that the provisions of the Tort Claims Act "shall not apply".[11] It would not be illogical to conclude that, in these categories of cases, the Act neither creates nor removes immunity but leaves the question of suability as it was before the Act, to be determined by other statutes and by common law rules. This interpretation is further bolstered by the construction which has been given to § 2680(*l*) and (m), which except the Tennessee Valley Authority and

the Panama Canal Company from the Act's provisions. These parallel provisions to the libel exception (h) have consistently been held not to create any immunity, but to allow suit to be brought against the organizations just as before the Act, under separate statutory authorizations.[12]

While logic and a consistent reading of the statute would, by themselves, thus lead us outside the Act at the very start, to inquire as to the Smithsonian's common law immunity status and as to other possible bases of jurisdiction, other factors cause us to reject this approach. Legislative history, the great weight of judicial precedent, and a desire to facilitate future application of the Act, convince us that § 2680(h) should be read as an affirmative grant of immunity to "federal agencies" in the types of deliberate tort cases which it describes.

We conclude from the structure of the Tort Claims Act, and from the legislative reports accompanying its passage, that Congress probably did not intend to leave unaffected by the Act the categories of suits excepted by § 2680(h). While primarily seeking to expand governmental liability for torts, it appears to us that Congress also sought to systematize and centralize the immunity laws.[13] One evidence of this appears in § 2679(a) of the statute, which in essence renders ineffective any other laws allowing suit or creating remedies against an agency, where the actions "are cogniza-

---

10. 28 U.S.C. § 2680. Exceptions

The provisions of this chapter and section 1346(b) of this title shall not apply to—

\* \* \* \* \* \*

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentations, deceit, or interference with contract rights.

11. There is not only the language of § 2680, the exceptions section, but its interrelation with § 1346(b), the jurisdictional section. The section entitled "Exceptions" begins: "The provisions of . . . section 1346(b) of this title shall not apply to . . . (h) Any claim arising out of . . . libel, slander . . ." If the section conferring jurisdiction simply does "not apply," can the Tort Claims Act have any relationship to an action for libel? We

conclude that it does, but the answer appears by no means as simple as has been assumed.

12. *Gardner v. Panama R.R.*, 342 U.S. 29, 31, 72 S.Ct. 12, 96 L.Ed. 31 (1951) (dictum); *Brewer v. Sheco Construction Co.*, 327 F.Supp. 1017, 1018–19 (W.D.Ky.1971); *Latch v. T.V.A.*, 312 F.Supp. 1069, 1071–72 (N.D.Miss.1970); *De Scala v. Panama Canal Co.*, 222 F.Supp. 931, 934 (S.D.N.Y.1963). The Congressional reports accompanying the Act explicitly indicate that some of the exceptions were included because "adequate remedies were already available." H.R.Rep. No. 1287, 79th Cong., 1st Sess., 6 (1945); S.Rep. No. 1400, 79th Cong., 2d Sess., 33 (1946).

13. *See Wickman v. Inland Waterways Corp.*, 78 F.Supp. 284, 286 (D.Minn.1948).

ble under section 1346(b)." [14]  Another evidence of this centralizing impulse appears in the context of exceptions clause § 2680(a).[15]  This section sets forth the category of discretionary activity, for which immunity has traditionally been granted. That Congress bothered to include it in the exceptions section is consistent with the view that it meant to embody, within § 2680 all of the instances in which immunity is to exist under the statute.  It seems to us an unreasonable conclusion, at least in the instances of exceptions (a) and (h), that Congress intended for courts to go beyond the Act, and inquire into common law immunity status and alternative jurisdictional grounds.

More affirmative, though still ambiguous, evidence that Congress saw itself as preempting the common law of immunity appears in the reports which accompanied the bill through the House and Senate.  In discussing the exclusivity provision,[16] the reports of both chambers make the following statement: [17]

*This will place torts of "suable" agencies of the United States upon precisely the same footing as torts of "nonsuable"*

agencies.  In both cases, the suits would be against the United States, subject to the limitations and safeguards of the bill; and in both cases the *exceptions of the bill would apply either by way of preventing recovery at all or by way of leaving recovery to some other act,* as, for example, the suits in Admiralty Act.  It is intended that *neither corporate status nor "sue and be sued" clauses shall, alone, be the basis for suits* for money recovery sounding in tort.

From these statements may be inferred a general intent to treat all federal agencies alike as regards immunity, irrespective of what their immunity status was at common law.[18]  We find it likely that Congress conceived of itself as codifying the immunity law, and eliminating any necessity to look at the common law, once it is concluded that the defendant is a federal agency within the definition of the Act.

We might perhaps take a different view of legislative intent if this were a matter of first impression.  But we give weight to the fact that since the time of enactment, it has been the consistent practice of the federal

---

**14.** 28 U.S.C. § 2679(a) (1970).  The exception clauses dealing with the T.V.A. and the Panama Canal Company, 28 U.S.C. § 2680(*l*) and (m) (1970), were clearly not intended to bar suit under separate authorizing statutes, *see* note 12 *supra,* and thus these clauses weaken somewhat the argument that the Act was intended to centralize all laws concerning federal governmental immunity.  However, the uniqueness of these organizations, coupled with the fact that their amenability to suit was well established at the time the exceptions were adopted, lead us to conclude that we are not bound by rigid parallelism to clauses (*l*) and (m) in our construction of clause(h).

**15.** 28 U.S.C. § 2680.  Exceptions

The provisions of this chapter and section 1346(b) of this title shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

**16.** Now 28 U.S.C. § 2679(a) (1970).

**17.** H.R.Rep. No. 1287, 79th Cong., 1st Sess., 6 (1945); S.Rep. No. 1400, 79th Cong., 2d Sess., 33–34 (1946) (emphasis added).

**18.** However, this inference is not compelled by the actual language of the reports.  The reports' statement, that suability clauses in agency charters do not affect the applicability of the Tort Claims Act, would not be in conflict with a view that common law immunity doctrine governs in cases thrown outside the Act by the language of the exceptions clause.  Nor would the statement that corporate status alone is not a basis for suit, be in conflict with a conclusion that the Smithsonian may have no operative immunity arising from common law, in light of its corporate status *and* its unique mix of private and governmental operations, funding, and management.  The language about the exception clauses either preventing recovery or leaving recovery to another Act also presents no inconsistency, since even if a court were to find operative common law immunity, a jurisdictional statute ("some other act") apart from the Act's § 1346(b) would have to be found for any suit to be entertained, at least in federal court.

courts to read both exceptions (a) and (h) as defining grants of immunity to "federal agencies." [19] The courts' consistent sense of legislative intention is impressive even though the decisions fail to acknowledge the difficulty presented by the literal text.[20]

We are also influenced, we must confess, by the consideration that a contrary reading of the statute would lead to perplexing questions as to the state of the common law, while not leading to a clear change of result in any imaginable case. For there to be any difference in result, the defendant would have to be within the "federal agency" definition of § 2674, and yet be sufficiently private as to lead to the inference that Congress, in creating the organization, intended not to render it immune.[21] Were both of these conditions met, it would be necessary, further, that the subject matter of the suit be within one of the clauses of § 2680 which are presently construed to confer immunity.

We cannot envisage that more than a few, if any, cases would meet all of these requirements, and thus be decided differently under a literal reading of the Act. Yet to determine whether it might be applicable would require the courts in a consider-able array of cases to make a complex and speculative inquiry into common law immunity status.[22] We think the legislature intended the courts to decide suability questions by direct reference to the statute rather than by pursuit of the will-o'-the-wisp of the prior law. We conclude that exception clause (h) should continue to be read as defining the existence of immunity in suits involving deliberate torts, and that the summary judgment in favor of Smithsonian should be affirmed.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, with whom J. SKELLY WRIGHT, Circuit Judge, joins, concurring:

This case cannot plausibly be distinguished from *Barr v. Matteo*[1] and surely we are not at liberty to disregard the Supreme Court's unmistakable holding therein. Perhaps that is all that really needs to be said. Frankness, however, compels me to admit increasing difficulty in reconciling *Barr* with other strands of jurisprudence evolving on the amenability of public servants to suits for damages.[2] I join in the disposition of this case, then, not out of any ability to divine the ultimate schematism of this area of the law, but because of the judge's duty to abide controlling precedent.

19. *Goddard v. District of Columbia Redevelopment Land Agency*, 109 U.S.App.D.C. 304, 306, 287 F.2d 343, 345, *cert. denied*, 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961); *United States v. Delta Indus. Inc.*, 275 F.Supp. 934, 936–37 (N.D.Ohio, 1966); *James v. F.D.I.C.*, 231 F.Supp. 475, 477 (W.D.La.1964); *Freeling v. F.D.I.C.*, 221 F.Supp. 955, 956–57 (W.D.Okl. 1962).

20. In *Goddard v. District of Columbia Redevelopment Land Agency*, 109 U.S.App.D.C. 304, 307, 287 F.2d 343, 346 (1961) the court asserts that libel claims "are cognizable under section 1346(b)" within the meaning of the exclusiveness of remedy provision, § 2679(a), even though the exceptions clause of § 2680(h) flatly states that the provisions of § 1346(b) "shall not apply to" libel. *Cf. Scanwell Laboratories, Inc. v. Thomas*, 172 U.S.App.D.C. 281, 286, 521 F.2d 941, 946 (1975), where the court observed, "If the claim falls outside the Act completely or within one of the exceptions-to-liability embodied in the statute, . . . ." without finding it necessary to explain how the claim for negligent misrepresentation might "fall outside the Act completely."

21. For discussions of how immunity status would be determined at common law, see *R.F.C. v. Menihan Corp.*, 312 U.S. 81, 84, 61 S.Ct. 485, 85 L.Ed. 595 (1941); *F.H.A. v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724 (1940); *Keifer & Keifer v. R.F.C.*, 306 U.S. 381, 389, 59 S.Ct. 516, 83 L.Ed. 784 (1939).

22. Case law indicates that the inquiry as to common law immunity must focus on whether Congress intended to confer immunity at the time the organization was created. *See* cases cited, note 21 *supra*. Yet it appears unlikely that any directly expressed Congressional intent could ever be found in the instance of a federal agency created after the passage of the Tort Claims Act, since Congress almost certainly gave no consideration to the immunity issue, but deferred instead to the framework of the Act.

1. 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

2. See notes 6–20 *infra* and accompanying text.

Few would suggest that public officers be made answerable in damages for good-faith errors in judgment, even when the result is exceedingly unfortunate. Fewer still would condone venally or maliciously motivated acts by public functionaries or their ofttimes appalling consequences. If recompense to victims implicated no more than the purses of callous bureaucrats, there would be no need for official immunity, for the availability of some sort of good faith defense would suffice to separate the sheep from the goats.

The problem is not nearly so simple, however, because a great deal more than monetary liability is at stake. The ease with which malice can be charged leaves open the possibility that even the conscientious public servant will be dogged by suitors. The mere prospect of a lawsuit may deter even the otherwise courageous official from the full and ardent discharge of altogether lawful duties, lest he become enmeshed in vexatious, though unfounded, litigation.

When an officer thus deviates from whole-hearted conservation of the common

weal, the public interest is to that extent disserved. The virtue of absolute immunity for public functionaries, as well as its sole justification, is that it safeguards against that measure of disservice. So it was that, with full appreciation of society's weighty interest in fairness to those injured by improper manipulation of the levers of government, the *Barr* Court struck the balance on the side of averting litigation of defamation claims, whether ill-founded or not, arising from statements made in the line of federal duty.[3] "[T]here may be occasional instances of actual injustice which may go unredressed," the Court said, "but we think that price a necessary one to pay for the greater good."[4] And, by extension of *Barr*, the generally accepted rule today is that the federal officeholder is totally immune to suit for damages attributed to any common law tort emanating from non-ministerial conduct within the outer perimeter of his official authority.[5]

Developments in related quarters, however, have introduced asymmetry in the

---

**3.** 360 U.S. at 571–576, 79 S.Ct. at 1339–1342, 3 L.Ed.2d at 1441–1444.

**4.** *Id.* at 576, 79 S.Ct. at 1342, 3 L.Ed.2d at 1442.

**5.** See, *e. g., David v. Cohen*, 132 U.S.App.D.C. 333, 337, 407 F.2d 1268, 1272 (1969) (defamation, abuse of process and malicious prosecution) and cases cited therein; *Berberian v. Gibney*, 514 F.2d 790, 793 (1st Cir. 1975) (abuse of process); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir.), *cert. denied*, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975) (interference with contractual relations); *Estate of Burks v. Ross*, 438 F.2d 230, 234–236 (6th Cir. 1971) (negligence); *Ruderer v. Meyer*, 413 F.2d 175, 178–179 (8th Cir.), *cert. denied*, 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235 (1969) (defamation and conspiracy); *Sowder v. Damron*, 457 F.2d 1182, 1184–1186 (10th Cir. 1972) (intentional infliction of emotional distress). See generally K. Davis, Administrative Law of the Seventies, § 26.00–2 at 580 (1976); K. Davis, Administrative Law §§ 26.01, 26.04 at 871, 875–880 (1970 Supp.).

Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 *et seq.* (1970 & Supp. V 1975), one who is injured by "the negligent or wrongful act or omission of any employee of the [Federal] Government while acting within the scope of his office or employment" has an action against the Government, 28 U.S.C. § 1346(b) (1970), and that remedy, where it obtains, is exclusive. 28 U.S.C. § 2679(a) (1970). But 28

U.S.C. § 2680(h) (Supp. IV 1974) exempts generally certain intentional torts from the operation of the Act. As a means of accommodating the antagonistic interests at stake in cases like that at bar, it has been urged that these exemptions be repealed, thus enabling the victim to recover from the Government but not the officer—who might then be the more susceptible to sanctions for misbehavior since the damage award would be coming out of his superior's budget. See K. Davis, Administrative Law of the Seventies, *supra*, § 26.03 at 584–597. See also Davis, *An Approach to Legal Control of the Police*, 52 Tex.L.Rev. 703, 720 n.47 (1974).

Congress has in fact taken a step in that direction by amending the Federal Tort Claims Act to permit recovery exclusively against the Government on claims of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" against federal investigative or law enforcement officers. Act of Mar. 16, 1974, Pub.L. No. 93–253, 88 Stat. 50, 28 U.S.C. §§ 2679–2680 (Supp. V 1975). The amendments as originally proposed would have extended to all federal employees, but were ultimately reduced to their present form. See Boger, Gitenstein & Verkuil, *The Federal Tort Claims Act Intentional Torts Amendments: An Interpretative Analysis*, 54 N.C.L. Rev. 497, 517 (1976).

field of official immunity. More than a century ago, by what is now 42 U.S.C. § 1983, Congress authorized civil actions by those deprived of federally secured rights through action under color of state law.[6] Much more recently, notwithstanding the facial broadness of Section 1983, the Supreme Court has recognized immunities for state officers from civil damage suits thereunder.[7] Unlike the invariably absolute immunity which *Barr* attaches to non-ministerial activity precipitating common law tort actions against those in federal service, immunity inherent in the functions of particular state offices for purposes of Section 1983 may be either absolute or qualified.[8] More importantly, the process of formulating Section 1983 immunities has involved careful appraisal of the degree to which the operations of the office might be impaired by the specter of groundless suit, and a weighing of the assessment thereon against the remedial purposes of the statute.[9] This category-by-category approach to immunity determinations, sensitive both to costs and to benefits, stands in sharp contrast to the *Barr* choice of immunity, which varies neither with the value of the premium it confers nor with the potential for harm it leaves in its wake.

Of course, congressional specification in Section 1983 of a right to monetary relief rules out judicial interposition of absolute immunity,[10] save only where a court may infer that Congress did not intend the statute to operate.[11] On the other hand, damage actions against federal officials for transgression of common law norms, such as the defamation action that was *Barr*, do not encounter any manifestation of legislative will that might stifle judicial implication of unlimited and unqualified immunity. What brings this doctrinal consonance to the point of discord is the still-developing body of law shaping the suability of federal

**6.** What is now 42 U.S.C. § 1983 (1970) was enacted in 1871 in order to supplement preexisting criminal penalties with civil remedies. See *Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 475–476, 5 L.Ed.2d 492, 496–497 (1961); *Developments in the Law—Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1155 (1977). Federal jurisdiction to entertain § 1983 actions is conferred by 28 U.S.C. § 1343(3) (1970).

**7.** The Court first addressed the issue in *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019, 1026–1027 (1951) (legislators immune from liability in damages when "acting in the sphere of legitimate legislative activity"). Earlier cases had not adverted to the possibility of such immunities. See, e. g., *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927). The Court has also construed § 1983 as affording absolute immunity to state judges. *Pierson v. Ray*, 386 U.S. 547, 554–555, 87 S.Ct. 1213, 1217–1218, 18 L.Ed.2d 288, 294–295 (1967), and prosecutors, *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). A qualified, "good faith" immunity under § 1983 has been extended to the superintendent of a state mental hospital, *O'Connor v. Donaldson*, 422 U.S. 563, 577, 95 S.Ct. 2486, 2494–2495, 45 L.Ed.2d 396, 408 (1975); members of a school board and other school officials, *Wood v. Strickland*, 420 U.S. 308, 321–322, 95 S.Ct. 992, 1000–1001, 43 L.Ed.2d 214, 224–225 (1975); the governor and other high state executive officers, *Scheuer v. Rhodes*, 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90, 103–104 (1974); and police officers, *Pierson v. Ray, supra*, 386 U.S. at 557, 87 S.Ct. at 1219, 18 L.Ed.2d at 296.

**8.** See note 7 *supra*.

**9.** Compare, e. g., *Imbler v. Pachtman, supra* note 7, 424 U.S. at 424–425, 96 S.Ct. at 992, 47 L.Ed.2d at 140 (threat of suit "would undermine performance of [a prosecutor's] duties" because of the frequency with which a disgruntled defendant would "transform his resentment . . . into the ascription of improper and malicious" motives), with *Wood v. Strickland, supra* note 7, 420 U.S. at 320, 95 S.Ct. at 1000, 43 L.Ed.2d at 224 ("absolute immunity [is not] justified since it would not sufficiently increase the ability of school officials to exercise their discretion . . . to warrant the absence of a remedy"), and *Scheuer v. Rhodes, supra* note 7, 416 U.S. at 243, 94 S.Ct. at 1690, 40 L.Ed.2d at 100 ("[f]inal resolution of [the immunity] question must take into account the functions and responsibilities of these particular defendants . . ., as well as the purposes of 42 U.S.C. § 1983").

**10.** See *Scheuer v. Rhodes, supra* note 7, 416 U.S. at 243, 94 S.Ct. at 1690, 40 L.Ed.2d at 100.

**11.** See, e. g., *Pierson v. Ray, supra* note 7, 386 U.S. at 554, 87 S.Ct. at 1218, 18 L.Ed.2d at 295; *Tenney v. Brandhove, supra* note 7, 341 U.S. at 376, 71 S.Ct. at 788, 95 L.Ed. at 1026–1027.

functionaries for damages charged to unconstitutional depredations. There, as in the situation *Barr* epitomizes, the judicial hand is unfettered by the legislature's command;[12] yet, since the Section 1983 immunity decisions have been deemed authoritative,[13] the immunity in vogue in that area may be either qualified or absolute.[14] The upshot is that one kind of judicially-fashioned immunity is available to federal officials in fending off damage suits founded on constitutional claims, and quite another—the *Barr*-type—to such officials in repulsing suits invoking the common law.[15]

The incongruity between immunities available to the same officer exercising the same functions, depending only upon the genesis of the legal standard by which his behavior is to be measured, strikes at the very foundations of the *Barr* rule. Many if not most constitutional torts have analogues in the common law.[16] Thus the official who finds himself charged with a tort of each sort—a common posture [17]—may assert against the common law claims his *Barr* immunity, but the travail of litigation—which that immunity is designed to spare him—largely remains since he still

12. See *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 394, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619, 625–626 (1971) (the "Federal question" whether Fourth Amendment rights have been invaded involves a claim independent of statute, "both necessary and sufficient to make out the plaintiff's cause of action"). *Cf.* K. Davis, Administrative Law of the Seventies, *supra* note 5, § 26.00–2 at 583–584 (noting that "[t]he *Barr* case applies to common law torts, and the Supreme Court in *Bivens* created a new federal common law tort"). See also Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv.L.Rev. 1532, 1540–1543 (1972).

13. See, *e. g.*, *Apton v. Wilson*, 165 U.S.App. D.C. 22, 31–33, 506 F.2d 83, 92–93 (1974); *Black v. United States*, 534 F.2d 524, 526 (2d Cir. 1976); *Bivens v. Six Unknown Named Agents*, 456 F.2d 1339, 1346 (2d Cir. 1972); *Paton v. La Prade*, 524 F.2d 862, 871 (3d Cir. 1975); *States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146, 1159 (4th Cir. 1974); *Tritsis v. Backer*, 501 F.2d 1021, 1022 (7th Cir. 1974); *Jones v. United States*, 536 F.2d 269, 271 (8th Cir. 1976); *Midwest Growers Co-op Corp. v. Kirkemo*, 533 F.2d 455, 463–464 (9th Cir. 1976); *Mark v. Groff*, 521 F.2d 1376, 1380 (9th Cir. 1975).

14. See cases cited *supra* note 13 and *infra* note 18.

15. See, *e. g.*, K. Davis, Administrative Law of the Seventies, *supra* note 5, § 26.00–2 at 573; Second Circuit Note, 1975 Term, 51 St. John L.Rev. 251, 275–276 (1977). But see *Economou v. United States Dep't of Agriculture*, 535 F.2d 688 (2d Cir. 1976), *cert. granted*, 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534 (1977).

16. As indicated by such cases as *Monroe v. Pape, supra* note 6, 365 U.S. at 169, 81 S.Ct. at 474, 5 L.Ed.2d at 495, and *Bell v. Hood*, 327 U.S. 678, 679, 66 S.Ct. 773, 774, 90 L.Ed. 939, 940 (1946), an action grounded in the Constitution's protections against unlawful searches and seizures may also contain allegations sufficient to generate a variety of common law claims, including trespass or unlawful entry, abuse of process, assault, false imprisonment, conversion and even intentional infliction of emotional distress. *Cf. Dellums v. Powell*, —— U.S.App.D.C. ——, at ——, ——, 566 F.2d 167 at 175–176 (1977) and cases cited therein; *Payne v. District of Columbia*, 182 U.S.App. D.C. 188, 196, 559 F.2d 809, 817 (1977) (per Robinson, J.); *Norton v. Turner*, 427 F.Supp. 138, 140 (E.D.Va.1977). So might an actionable violation of the First Amendment involve similarly tortious activity. *Dellums v. Powell, supra,* at —— of 184 U.S.App.D.C., at 194 of 566 F.2d & n.80. An outrageous instance of medical malpractice may, if practiced in a prison, infringe the Eighth Amendment. *Cf. Estelle v. Gamble*, 429 U.S. 97, 106–107, 97 S.Ct. 285, 292–293, 50 L.Ed.2d 251, 261–262 (1977). In limited circumstances, a breach of contract may implicate the Due Process Clause, *cf. Cardinale v. Washington Technical Inst.*, 163 U.S. App.D.C. 123, 128, 500 F.2d 791, 796 (1974) as may a libel. Compare *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), with *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

17. Common law tort claims have been joined with constitutional tort claims in a host of recent cases, including *Dellums v. Powell, supra* note 16, at —— of 184 U.S.App.D.C., at 175–176 of 566 F.2d; *Carter v. Carlson*, 144 U.S. App.D.C. 388, 392–393, 447 F.2d 358, 362–363 (1971), *rev'd on other grounds*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *David v. Cohen, supra* note 5, 132 U.S.App.D.C. at 335, 407 F.2d at 1270; *Paton v. La Prade, supra* note 13, 524 F.2d at 866; *Roberts v. Williams*, 456 F.2d 819, 828–829 (5th Cir.), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971); *Williams v. Gorton*, 529 F.2d 668, 670–671 (9th Cir. 1976); *Norton v. Turner, supra* note 16, 427 F.Supp. at 140. See also *Pierson v. Ray, supra* note 7.

has the burden of defending on the constitutional claim, albeit on the basis of qualified privilege. Friction with *Barr* runs even deeper, since the same commonsense assumption that underlies its holding suggests that far-sighted officials will guard against vexatious litigation rooted in the Constitution. One may thus question how much their resoluteness in job performance will be bolstered by *Barr's* assurance of absolute immunity, which protects them only from the same annoyance couched in the principles of the common law.

That constitutional rights have a status in our jurisprudence which common law rights can never attain does not satisfactorily explain the line presently drawn.[18] If its justification lies in our greater willingness to risk exposure of public servants to personal liability when vindicating constitutional rights than when enforcing more pedestrian legal norms, one may wonder whether absolute immunity ought ever to be conferred in constitutional tort actions, as indeed it sometimes is.[19] One may also suspect that in such actions, no less than in Section 1983 suits, the constitutional origins of the plaintiff's claim may be less efficacious than the historical stature of particular immunities in the determination of whether the protection from suit is to be qualified or absolute.[20]

I speak to these matters to acknowledge a dilemma, and not in any endeavor to orchestrate the field of public-servant liability, in which the Supreme Court occupies by far the major role. It may be that further enlightenment will come from the Court's forthcoming *Economou* decisions.[21] In any event, my bounden duty at the moment is to follow *Barr,* in my view without any effort at reexamination of its holding or its rationale. For "[s]ave only for the exceptional cases where the proper decisional result is very clear, it is for the Supreme Court, not us, to proclaim error in its past rulings, or their erosion by its adjudications since." [22]

WILKEY, Circuit Judge (concurring dubitante):

While I concur in the judgment of this court, I do so with serious doubts about the present validity of *Barr v. Matteo,*[1] the Supreme Court decision that the majority views as controlling on the question of executive immunity. For the reasons stated by the majority and amplified by my discussion in Part I, *infra,* I do not doubt that the absolute immunity afforded by *Barr v. Matteo* represents sound policy, as much now as it did when it was decided. However, in the various § 1983 cases that have intervened since *Barr,* the Supreme Court appears to have described the immunity generally available to executive officials *in common law actions* as being only a qualified immunity. As I will explain more fully below in Part II, *infra,* the Court's persistence in this description, set out first in *Scheuer v. Rhodes,*[2] and ratified twice thereafter,[3] leads me to doubt whether the

18. *Cf.* K. Davis, Administrative Law of the Seventies, *supra* note 5, § 26.00–2 at 583–584 ("the court should not have to say yes or no to such questions as whether one has a *constitutional* right not to be shot at by an officer, not to be hit in the jaw with an officer's fist, not to have one's property damaged by an officer, not to have one's privacy invaded, not to have one's reputation sullied") (emphasis in original).

19. See, *e. g., Apton v. Wilson, supra* note 13, 165 U.S.App.D.C. at 29–33, 506 F.2d at 90–93.

20. See, *e. g., Imbler v. Pachtman, supra* note 7, 424 U.S. at 417–429, 96 S.Ct. at 988–994, 47 L.Ed.2d at 136–143; *Scheuer v. Rhodes, supra* note 7, 416 U.S. at 239–247, 94 S.Ct. at 1687–1692, 40 L.Ed.2d at 98–103; *Apton v. Wilson,*

*supra* note 13, 165 U.S.App.D.C. at 29–30, 506 F.2d at 90–91.

21. *Economou v. United States Dep't of Agriculture, supra* note 15.

22. *Breakefield v. District of Columbia,* 143 U.S. App.D.C. 203, 206, 442 F.2d 1227, 1230 (1970), *cert. denied,* 401 U.S. 909, 91 S.Ct. 871, 27 L.Ed.2d 807 (1971).

1. 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

2. 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

3. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Wood v. Strick-*

Court is still committed to the absolute immunity of *Barr.* Since it is the Court's prerogative to overrule its own decisions, if it wishes, I join, although *dubitante,* in the judgment of this court in reliance upon *Barr.*[4]

I

At first exposure the doctrine of absolute immunity for government officials in common law tort actions appears to be a harsh doctrine indeed. Someone who has incontestably been hurt as a result of the tortious conduct of a government official may be denied any compensation, regardless of the magnitude of the injury. Similarly, no matter how malicious an official's action may appear to be, the operation of absolute immunity may preclude inquiry in a civil suit for damages into the reasonableness of his behavior, even if it appears that there will be no review of his action by other means. In terms of compensation denied and accountability foreclosed, absolute immunity may often seem distasteful in its rigidity. For these and other reasons, well-respected commentators have called for an overruling of *Barr,* so that for common law torts as is already the case for constitutional torts executive officials will have only a qualified immunity.[5]

Recognizing that the rule of absolute immunity imposes real costs, the relevant question becomes whether the benefits to be derived from the doctrine justify these costs. The *Barr* Court openly confronted this question and decided that the contribution of absolute immunity to "the effective functioning of government" outweighed the loss of litigant rights.[6] As Justice Harlan concluded:

> To be sure, as with any rule of law which attempts to reconcile fundamentally antagonistic social policies, there may be

*land,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

**4.** As the majority opinion explains at p. —— of 184 U.S.App.D.C., p. 291 of 566 F.2d n. 2, the panel had remanded the question of official immunity to the trial court for its choice between absolute and qualified immunity, a choice to be determined by an individualized balancing of relevant factors. The remand directed by the panel was based upon a reading of the Supreme Court cases, particularly *Barr,* as requiring such an individualized balancing. Upon further study and reflection, however, I am now of the view that the balancing engaged in by the Supreme Court was aimed at formulating rules of immunity for categories of officials, as defined by function. The Court's inquiry into the facts of each case has typically, as in *Barr,* been for purposes of deciding whether the official in question was acting within the scope of his authority and not for purposes of making an *ad hoc* balancing as to the appropriate immunity for that official alone. *Barr,* in other words, was establishing the rule that executive officials at all levels were to be accorded absolute immunity from civil suit for all actions of a discretionary nature within "the outer perimeter" of the officials' "line of duty." 360 U.S. at 575, 79 S.Ct. 1335.

In restudying *Barr* and the intervening § 1983 cases, however, I have also come to the view that the language and the logic of the recent cases puts the present validity of *Barr* into doubt, even as to common law torts. Particularly since the Supreme Court will have occasion next Term in *Economou v. U.S. Dept. of Agriculture,* 535 F.2d 688 (2d Cir.), *cert. granted sub nom., Butz v. Economou,* 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534 (1977), to reconsider *Barr,* I feel obliged to express my doubts, although, as noted, my view is that the *Barr* rule represents sound policy.

**5.** Professor Davis, for example, looks for "an early overruling" of *Barr,* citing as "undesirable" and "[un]workable" the distinction between the absolute immunity of *Barr* for common law torts and the qualified immunity of *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed. 90 (1974) for "constitutional" torts. Davis, *Administrative Law of the Seventies,* § 26.00–2 at 584 (1976). In a concurring opinion in this case, slip op. at 6, Judge Robinson also explains and criticizes the "incongruity between immunities available to the same officer exercising the same functions," turning only on whether the tort he commits is characterized as constitutional or common law, although Judge Robinson refrains from suggesting that *Barr* be overruled. *See also* Vaughn, *The Personal Accountability of Public Employees,* 25 Am.U.L.Rev. 85 (1975), *quoting* Aeschylus: "For what mortal is righteous if he nothing fear?"

**6.** 360 U.S. at 573, 79 S.Ct. 1335. As Judge Leventhal notes, maj. at p. —— of 184 U.S. App.D.C. n. 4, p. 291 of 566 F.2d Justice Harlan's reasoning about absolute immunity won the support of a majority although his opinion was for a plurality of the Court.

occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good.[7]

Critical to the balance struck by *Barr* was the view that the threat of personal liability hanging over an individual officer "might appreciably inhibit the fearless, vigorous, and effective administration of policies of government."[8] As Judge Leventhal has pointed out, it is as much a concern today that the possibility of personal liability will "chill" forthright government administration as it was in 1959, the year of *Barr*. If anything, with government regulation touching many more aspects of American life and with the stakes of regulation correspondingly more significant, there is even more reason today to expect "counter-attacks," in Judge Leventhal's phrase, against the officials who are charged with making the difficult and sensitive decisions of administration.

It is argued, however, that precisely because so much can turn upon the actions of executive officials, then there must be civil damage suits available in order to hold them accountable for their conduct.[9] To begin with, however, many of the actions by federal executive officials, which may give rise to common law torts, are subject to review and correction by courts under the Administrative Procedure Act and other statutory review provisions. In addition, the conduct of executive officials may be subject to a wide range of alternative oversight—by the press, by Congress, by the public, and by internal agency personnel. And, of course, the absolute tort immunity of *Barr* does not foreclose any possible criminal prosecutions of government officials who violate the law.[10]

If it is thought that these possible methods of oversight are still inadequate to assure full and fair accountability—and on occasion misbehavior by executive officials surely does go unchecked—it is not easy to know what courts should do about it. One possibility is that absolute or qualified immunity might turn on an assessment by a court *in each case* whether the allegedly tortious action of the officer was indeed subject to review or scrutiny by other means or in another forum. If not, then the civil damage suit can be allowed to proceed, with the award of only a qualified immunity, so that the officer will be called to answer for his conduct.

In my estimation this is an unwise and unworkable approach. An assessment of whether alleged misbehavior has been "adequately" reviewed and/or corrected by other means may often have to involve further proceedings and factual findings, a possibility which undercuts the purpose of absolute immunity, as expressed in *Imbler v. Pacht-*

---

7. *Id.* at 576, 79 S.Ct. at 1342.

8. *Id.* at 571, 79 S.Ct. at 1339.

9. This argument has been made most forcibly with regard to the abuse of basic civil liberties by government officials. Dean Prosser contends, for example, that:

it may seriously be questioned whether the removal of the possible deterrent effect of the individual's tort liability, at least for oppressive and outrageous conduct, would be at all a desirable thing. There once was a disreputable character named John Wilkes, whose newspaper was raided and put out of business, his premises illegally searched, and his property seized and confiscated, all for the worst kind of political motives. The tort actions which arose out of this high-handed piece of oppression were long regarded as a major blow struck for the freedom of the individual against the abuse of governmental power; and so long as cheap and conniving politicians continue to abuse that power, they should not be forgotten.

Prosser, *The Law of Torts*, § 132 at 992 (4th ed. 1971). In line with this plea, the availability of § 1983 and *Bivens*-type relief against most classes of officials for violations of constitutional rights does provide a special check on abuses of "our most cherished liberties." *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974).

10. *Imbler v. Pachtman*, 424 U.S. 409, 429, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

man,[11] to provide protection *at the outset* from trial and liability. Moreover, a variable criterion such as this adds a further element of judgment and uncertainty to the process of choice between immunities, thereby importing the "chilling" effect of possible liability. How does a trial court assess, for example, the fact that there was no "official" disciplinary inquiry into alleged wrongdoing? What if this is because the various supervisors believed on the record before them that no wrongdoing had taken place and that the challenged conduct was justified? I suggest, in brief, that it is inappropriate to immunity doctrine, and inconsistent with Supreme Court practice,[12] to have absolute immunity awarded or taken away depending on whether there was, as seen in retrospect, alternative review of the incident in question.

In terms of assuring accountability, then, the other alternative is to drop absolute immunity for common law torts altogether, so that the reasonableness of every official action can be tested. Yet this need not involve a direct legal action against the executive official personally. And, as noted earlier, because this net of civil liability is so wide, and will entrap the innocent official along with the guilty, the policy preference has been for absolute immunity instead, which—ideally—encourages executive officials to act in a fearless, public-spirited way without the risk of immense personal liability. It seems to me that if the balance struck by *Barr* is deemed unsatis-

factory, then the response should be legislative—the waiver of sovereign immunity for intentional torts.

If the complaint is that it is very unjust that there are uncompensated injuries from common law torts, then the preferable solution is to amend the Federal Tort Claims Act to cover intentional torts, like libel and slander, which are presently excluded.[13] Surely in terms of realistic compensation, this change would provide a more effective remedy than the abandonment of absolute immunity, leaving monetary relief only against the officer. Similarly, if the complaint is that absolute immunity is resulting in a widespread unaccountability for common law torts, the preferable solution again may be to amend the Torts Claims Act to cover intentional torts. With regard to intentional torts, such as abuses by police officers, for example, it has often been thought that the imposition of judgments on governmental units may induce the higher officials to see that there is better training in the avoidance of wrongdoing and more effective oversight on the charges of misconduct.[14]

Indeed, with further changes in the Torts Claims Act, the government could secure the power, if it wished, to collect from the wrongdoing officer for malicious or egregious torts. This approach, if fairly and consistently administered, could bring a greater measure of accountability for the individual wrongdoer without imposing the degree of "chill" expected from the aban-

---

11. *Id.* at 419 n. 13, 96 S.Ct. 984.

12. In *Imbler,* for example, the Court considered the "amenability" of prosecutors as a class as a factor weighing for absolute immunity but did not inquire into whether *that* prosecutor in particular was the subject of an official inquiry into his alleged misconduct. *Id.* at 429, 96 S.Ct. 984.

13. 28 U.S.C. § 2680(h), as amended.

14. In urging Congress to assume liability for the Fourth Amendment torts of federal officers, Chief Justice Burger noted with respect to private security guards that, "[d]amage verdicts for such acts are often sufficient in size to provide an effective deterrent and stimulate employers to corrective action." *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388,

422 n. 5, 91 S.Ct. 1999, 2018, 29 L.Ed.2d 619 (1971) (dissenting opinion). This rationale has also been suggested as a reason for implying a *Bivens*-type cause of action directly against municipalities under the Fourteenth Amendment, Note, *Damage Remedies Against Municipalities For Constitutional Violations,* 89 Harv. L.Rev. 922, 927 (1976): "The threat of monetary judgments against governmental units may . . . spur higher officials to design their hiring and training programs, disciplinary procedures, and internal rules so as to curb misconduct." *See also* Davis, Administrative Law Treatise, 1970 Supplement, § 25.17 at 864–65.

donment of absolute immunity. For with a waiver of sovereign immunity for intentional torts, the officer knows that the government will assume whatever judgment may ensue from an uncertain trial on liability and damages. Personal liability, the primary source of the "chill" upon the exercise of unintimidated discretion, would depend instead upon a disciplinary screening *by the government* about when to pursue recovery from the officer and about how much recovery to seek. Presumably this screening will be less unpredictable and capricious than present trial and jury outcomes against an officer and would thus provide a more fine-tuned way of holding accountable those who maliciously abuse their power.

Motivated by some of the considerations suggested above, Congress has already changed the Tort Claims Act so as to make the federal government financially responsible for the intentional torts of some of its officers. With a 1974 amendment sovereign immunity was waived for claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process or malicious prosecution" which are committed by United States "investigative or law enforcement officers." [15] Whether Congress should further amend the Tort Claims Act to include the intentional torts of other officers, many of which would be common law torts, remains, of course, a matter of legislative judgment. Similarly, whether

coverage of intentional torts by the government should include a right to seek indemnity from the officers involved also calls for an exercise of judgment by the legislature. [16]

Recognizing the responsibility of Congress for the basic structure of the Tort Claims Act, I am unwilling to drop the absolute immunity of *Barr,* thereby leaving federal executive officials with only a qualified immunity for common law torts, in an effort to induce Congress to make further amendments to the Torts Claims Act. *Barr* has been rightly viewed as an aid to effective government and because its abandonment would thus impair public-spirited administration by the executive branch, its absolute immunity should be retained until a workable substitute, such as a waiver of sovereign immunity, is in place.

## II

In 1959 *Barr v. Matteo* [17] established the rule of federal common law that executive officials at all levels were entitled to absolute immunity from civil damage suits for those torts which involved action of a discretionary nature and which were taken within the scope of their authority. Over the years the Supreme Court appears to have adhered to the *Barr* rule [18] and, most notably, in 1973, did "not disturb the judgment" [19] of a lower court, which had found

---

**15.** 28 U.S.C. § 2680(h), as amended 16 Mar. 1974, Pub.L. 93–253, § 2, 88 Stat. 50.

In connection with the availability of compensation, as mentioned above, the Senate Report stated: "Of course, Federal agents are usually judgment proof so this [a cause of action against the individual officer] is a rather hollow remedy." S.Rep.No.588, 93rd Cong., 1st Sess. 3, *reprinted in* [1974] U.S.Code Cong. & Admin.News pp. 2789, 2790.

**16.** *Cf. United States v. Gilman,* 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898 (1954). Even though the common law rule is that an employer can generally recover from an employee, a unanimous Supreme Court held in *Gilman* that the government could not recover from an employee after it had been held liable under the Federal Tort Claims Act for the employee's negligent act. Emphasizing that it was for Congress to formulate its policies towards employees under the Tort Claims Act, the Court declined to

impose its own solution on what it viewed as a complex and significant issue.

**17.** 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434.

**18.** In *Wheeldin v. Wheeler,* 373 U.S. 647, 650–51, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), for example, the Court found *Barr* inapplicable because the official was not acting within the scope of his authority, with no question as to *Barr*'s acceptance.

**19.** *Doe v. McMillan,* 412 U.S. 306, 327 n. 15, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), *aff'g in relevant part, Doe v. McMillan,* 148 U.S.App.D.C. 280, 292–295, 459 F.2d 1304, 1316–1319 (1972). With regard to other nonlegislative officials the Supreme Court found no independent absolute immunity but did so in a manner consistent with *Barr.* In an examination of the challenged actions of the Public Printer and the Superin-

absolute immunity under *Barr* for federal officials performing discretionary acts within their duty. In three subsequent immunity cases under § 1983, the Court, however, appears to have described the common law for executive officials as affording only a qualified immunity, even as to common law torts. With no clear indication that the Court was only describing state common law as opposed to federal common law, I am concerned about whether this undercuts the *Barr* rule and feel obliged to explain my doubts. Because of the ambiguity inhering in the Court's recent approach, it becomes necessary to trace in some detail its description of the common law.

In 1974, *Scheuer v. Rhodes*[20] presented the question of whether there should be absolute or qualified immunity in a suit for damages under § 1983 for the Governor and other high officials of a state, the president of a state university and members of the state National Guard. Noting that § 1983 was meant to give a remedy to parties deprived of their constitutional rights, the Court also repeated that § 1983 did not mean "to abolish wholesale all common law immunities."[21] With this suggestion that the common law would be a helpful guide in structuring immunities under § 1983, the Court turned to a review of its three past determinations. In 1951 the Court had recognized absolute immunity for state legislators, noting the history of the absolute immunity at common law, *Tenney v. Brandhove.*[22] Similarly in 1967 the Court had afforded absolute immunity to state judges sued under § 1983, again noting the absolute immunity of the common law, *Pierson v. Ray.*[23] Lastly, in its review, the *Scheuer* Court came to the other class of officials

involved in *Pierson*—local police officers. Noting that the common law had not granted them an absolute immunity, *Pierson v. Ray*[24] made available to them "the defense of good faith and probable cause."

At this juncture in *Scheuer* one expects the Court to state next: 1) what the immunity at common law would be for executive officials like these, charged with some analogous tort, like wrongful death, and 2) whether that common law immunity, be it absolute or qualified, will be carried over, for whatever policy reasons, into § 1983 actions. This was essentially the analysis embodied in *Tenney* and *Pierson* and was expressly the analysis employed in the later cases of *Wood v. Strickland*[25] and *Imbler v. Pachtman,*[26] which also transplanted their respective common law immunities. But the paragraphs that one next expects in *Scheuer* are not there; instead, there are the next two sentences:

> When a court evaluates police conduct relating to an arrest its guideline is "good faith and probable cause." [*Pierson*] In the case of higher officers of the executive branch, however, the inquiry is far more complex since the range of decisions and choices—whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions—is virtually infinite.[27]

What these sentences suggest is that the *Scheuer* Court *had already decided*, without setting out its customary analysis, that only qualified immunity would be available. In other words, the first sentence repeated from *Pierson* that a qualified immunity means that a court should inquire into whether a police officer made an arrest

---

tendent of Documents, the Court found that their actions, although authorized, involved the exercise of no significant discretion, thus taking them outside the ambit of *Barr. See Doe v. McMillan,* 185 U.S.App.D.C., ——, 566 F.2d 713 (1977) (on remand).

**20.** 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90.

**21.** *Id.* at 243, 94 S.Ct. at 1690, *quoting Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

**22.** 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019.

**23.** 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288.

**24.** *Id.* at 557, 87 S.Ct. 1213, 1219.

**25.** 420 U.S. 308, 318, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

**26.** 424 U.S. 409, 424, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

**27.** *Scheuer, supra* at 245–46, 94 S.Ct. at 1691.

with "good faith and probable cause." The phrase—"the inquiry"—in the second sentence thus referred to what a court should inquire into in determining whether "higher officers of the executive branch" also have satisfied the reasonableness standard of qualified immunity. In the remainder of the long paragraph begun with these sentences the Court essentially established that *in applying qualified immunity to higher officers of the executive branch* a court must be very sensitive to the demands of their office, *e. g.,* the occasional need for prompt decisive action and the obvious need to rely on facts supplied by others. The Court also emphasized that because the options of these high officials may be so broad and so subtle, their "range of discretion" for purposes of immunity had to be read very widely.[28] *Scheuer* concluded from these considerations that the qualified immunity available to officers of the executive branch of government had to vary in scope, "the variation being dependent on the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based."[29] In sum, then, it appears that the focus of the Court's attention in *Scheuer* was upon an appropriate definition of qualified immunity;[30] the choice between immunities appears to have been made with little

discussion and without the systematic approach found in similar cases.[31]

In the various restatements of *Scheuer,* however, the Court has described that decision in terms of its usual systematic approach, thereby casting some light on what it considered as the common law tradition for the immunity of executive officers. In *Wood v. Strickland,*[32] the Court said that it had granted a qualified immunity to the *Scheuer* defendants, *"under prior precedent* and in light of the obvious need to avoid discouraging effective official action by public officials charged with a considerable range of responsibility and discretion . . . ." After quoting *Scheuer's* formulation of qualified immunity, *Wood* continued:

> Common-law tradition, *recognized in our prior decisions,* and strong public-policy reasons also lead to a construction of § 1983 extending a qualified good-faith immunity to school board members from liability for damages under that section.[33]

The implication from both of these quoted sentences is that the *Scheuer* outcome of qualified immunity for executive officers accorded with common law precedent.

The next immunity case, *Imbler v. Pachtman, supra,* described *Scheuer* in similar terms. After stating that "the Governor

---

**28.** *Id.* at 247, 96 S.Ct. 1690. At this point, *Scheuer* quotes Justice Harlan's counsel from *Barr* that the scope of discretion must be tailored to the broad or narrow duties of executive officers at different levels. Contrary to the majority's characterization, at p. —— of 184 U.S.App.D.C., p. 293 of 566 F.2d, this is not a citation of *Barr* for the proposition that there must be absolute immunity for executive discretionary acts in the context of defamation actions. As will be developed, *infra,* the *Scheuer* Court appeared to consider qualified immunity as the common law protection available to executive officers.

**29.** *Scheuer, supra* at 247, 94 S.Ct. at 1692.

**30.** It is noteworthy that at this stage of the case the threshold issues of scope of authority and discretionary action still remained for decision on remand, in addition to the major issue of the reasonableness and good faith of the alleged constitutional violations. *See id.* at 250, 94 S.Ct. 984.

**31.** Before closing the discussion of immunities the Court stated that "[u]nder the criteria developed by precedents of this Court, § 1983 would be drained of all meaning were we to hold that the acts of a governor or other high executive officer . . . " were entitled to absolute immunity. *Id.* at 248, 94 S.Ct. at 1692. The meaning of this is not clear, for twice before the Court had granted absolute immunity to two classes of state officials, legislators and judges, in significant part because of their absolute immunity at common law. If the Court had regarded high executive officials as also having an absolute immunity at common law, it may well have comported with the precedents of § 1983 to have continued their absolute immunity here.

**32.** 420 U.S. at 317–18, 95 S.Ct. at 998 (emphasis added).

**33.** *Id.* at 318, 95 S.Ct. at 999 (emphasis added).

and other executive officials of a State" had only a qualified immunity under *Scheuer* for § 1983 suits, *Imbler* characterized that process of choice between immunities as follows:

> In *Scheuer* and in *Wood,* as in the two earlier cases, [*Tenney* and *Pierson*], the considerations underlying the nature of the immunity of the respective officials in suits at common law led to essentially the same immunity under § 1983. See 420 U.S., at 318–321 [95 S.Ct. 992]; 416 U.S. at 239–247 [94 S.Ct. 1683] and n. 4.[34]

Here, even more clearly than in *Wood,* the *Imbler* Court appears to be saying that the executive officials in *Scheuer* would have been entitled to only a qualified immunity at common law. What is the support for this that the Court finds in its citations back to *Scheuer*? As already noted, from the point in *Scheuer* when the Court puts the question as to these executive officials (p. 242, 94 S.Ct. 1683) through the close of the analysis (p. 247, 94 S.Ct. 1683) there is no indication of what the immunity of executive officials would be at common law. *Imbler* must be drawing its conclusion, then, from the earlier pages of general discussion (239–242, 94 S.Ct. 1683) and from n. 4, which are the portions specifically cited (see quote above). In the text of *Scheuer* at 239, 94 S.Ct. 1683, 1688, official immunity is said to derive from the same considerations that generated sovereign immunity. *Scheuer* continues: "While the latter doctrine—that the 'King can do no wrong'—did not protect all government officers from personal liability, the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability." Attached to that last sentence is the cited footnote 4, which described the structure of official immunity at common law. Due to its significance I have set out the entire note as follows:

> 4 In England legislative immunity was secured after a long struggle, by the Bill of Rights of 1689: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament," 1 W. & M., Sess. 2, c. 2. See *Stockdale v. Hansard,* 9 Ad. & E., 1, 113–114, 112 Eng.Rep. 1112, 1155–1156 (Q. B. 1839). The English experience, of course, guided the drafters of our "Speech or Debate" Clause. See *Tenney v. Brandhove,* 341 U.S. 367, 372–375 [71 S.Ct. 783, 95 L.Ed. 1019] (1951); *United States v. Johnson,* 383 U.S. 169, 177–178, 181 [86 S.Ct. 749, 15 L.Ed.2d 681] (1966); *United States v. Brewster,* 408 U.S. 501 [92 S.Ct. 2531, 33 L.Ed.2d 507] (1972).
>
> In regard to judicial immunity, Holdsworth notes: "In the case of courts of record . . . it was held, certainly as early as Edward III's reign, that a litigant could not go behind the record, in order to make a judge civilly or criminally liable for an abuse of his jurisdiction." 6 W. Holdsworth. A History of English Law 235 (1927). The modern concept owes much to the elaboration and restatement of Coke and other judges of the sixteenth and early seventeenth centuries. *Id.,* at 234 *et seq.* See *Floyd v. Barker,* 12 Co.Rep. 23, 77 Eng.Rep. 1305 (K. B. 1607). The immunity of the Crown has traditionally been of a more limited nature. Officers of the Crown were at first insulated from responsibility since the King could claim the act as his own. This absolute insulation was gradually eroded. Statute of Westminster I, 3 Edw. 1, c. 24 (1275) (repealed); Statute of Westminster II, 13 Edw. 1, c. 13 (1285) (repealed). The development of liability, especially during the times of the Tudors and Stuarts, was slow; see, e. g., Public Officers Protection Act, 7 Jac. 1, c. 5 (1609) (repealed). With the accession of William and Mary, the liability of officers saw what Jaffe has termed "a most remarkable and significant extension" in *Ashby v. White,* 1 Bro.P.C. 62, 1 Eng.Rep. 417 (H. L. 1704), reversing 6 Mod. 45, 87 Eng.Rep. 808 (Q. B. 1703). Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L.Rev. 1, 14

---

**34.** *Imbler, supra* at 419, 96 S.Ct. at 989.

(1963); A. Dicey, The Law of the Constitution 193–194 (10th ed. 1959) (footnotes omitted). See generally *Barr v. Matteo*, 360 U.S. 564 [79 S.Ct. 1335, 3 L.Ed.2d 1434] (1959). Good-faith performance of a discretionary duty has remained, it seems, a defense. See Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 216 (1963). See also *Spalding v. Vilas*, 161 U.S. 483, 493 [16 S.Ct. 631, 40 L.Ed. 780] *et seq.* (1896).

The last two sentences of this footnote are of particular interest. With the reference to the significant extension of liability in 1704, the Court gives one the impression that since 1704, at least, "[t]he immunity of the Crown has traditionally been of a more limited nature," *supra,* than the absolute immunity described, *supra,* for legislators and judges. And then the Court confirms this impression with the last sentence: "Good-faith performance of a discretionary duty has remained, it seems, a defense." On the basis of these sentences, unqualified by any further language, it would appear, according to *Scheuer,* that the common law has evolved a rule of *qualified* immunity for executive officials as to all torts. If, moreover, *Scheuer* has described the common law as it applies to *federal* officials, then one wonders whether the absolute immunity of *Barr* retains all of its force.

It may be, as I will explore below, that footnote 4 was describing instead the state common law or some traditional, perhaps English, common law, which would then distinguish and leave intact the federal common law of *Barr*. These must, of necessity, be real possibilities because, as is obvious above, the footnote itself cites to *Barr,* with apparent neutrality. For various reasons, however, it is not conclusive that footnote 4 was not describing federal common

law. Thus, in my estimation, *Barr* is still put in doubt.

The first possibility is that the *Scheuer* Court was describing the evolution of English common law, apart from the American experience. Contributing to the possibility is the placement of the footnote—in a paragraph about the origins of official immunity—as well as its content—primarily about English cases and statutes. Yet it is not clear that the finishing stroke of the note, that good-faith immunity "remains" as the common law, is meant to pertain only to English law. Most significantly, Justice Powell, writing in *Imbler, supra,* cited expressly to "n. 4" in support of the underlying proposition that the state executive officials had only a qualified immunity "in suits at common law." [35]

The other possibility, then, is that the Court meant to describe the state common law in its finishing statement of note 4, perhaps in addition to summing up the evolution of British law. Supporting this possibility is the analysis of *Wood v. Strickland* [36] where the inquiry into common law immunity was into what "state courts have generally recognized . . . under state law." On the other hand, *Pierson v. Ray* [37] directed that the search for the common law immunity be for "the prevailing view in this country," which would presumably take into account the federal common law. And, most recently, *Imbler v. Pachtman* [38] considered both the "majority rule" of the state cases as well as its own view of the federal common law, citing *Yaselli v. Goff.* [39]

One initial conclusion to draw from these cases is that the Court does not look to the particular common law of the defendant's state as the starting point. [40] State law is

35. See text at n. 34, *supra.* In addition, in the law review article cited to accompany the last sentence of footnote 4, Professor Jaffe was discussing official immunity in general, with particular attention to *this* country.

36. 420 U.S. at 318, 95 S.Ct. at 999.

37. 386 U.S. at 547, 87 S.Ct. 1213.

38. 424 U.S. at 422, 96 S.Ct. 984.

39. 12 F.2d 396, *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (per curiam).

40. *Scheuer,* for example, did not consider the state law of Ohio or even say what it was. Were it otherwise, the § 1983 immunity might vary from state to state for the same class of

consulted in order to find the more settled common law, but even the majority state view is tempered by the federal common law, which is deserving of its own weight. From these sources the Court distills the common law "tradition," which it then decides whether or not to carry over to § 1983.

Footnote 4, then, was drawing upon, or including federal common law, i. e., Barr v. Matteo, in describing the immunity for executive officials as qualified. And, according to Professor Jaffe, whose articles were cited in Scheuer[41] as important sources, Barr had to be considered as the "leading case in the field" extending absolute immunity to executives below Cabinet rank.[42] While the Barr rule may not have been accepted by the majority of states,[43] it was still, as noted, a leading case to assess in distilling the common law for purposes of § 1983 analysis. It may have been that Scheuer meant to leave Barr entirely intact, as an untraditional, minority view. Footnote 4, after all, cannot be read with complete literalness; it surely did not intend, for example, to suggest that Spalding v. Vilas[44] was no longer the common law.[45]

Yet in Scheuer's description of the common law as affording only a qualified immunity, at least as to inferior executive officers, I cannot safely assume that the Court was not reflecting some doubt about Barr. If the Court had said there, or in the later cases, that the common law tradition in Scheuer was based upon the majority state view, then Barr, in my estimation, could be applied with no hesitation. But with Barr's present status unsettled, I can concur only dubitante.

officials, surely an inappropriate outcome for a federal cause of action. See Fidtler v. Rundle, 497 F.2d 794, 799–800 (3rd Cir. 1974).

**41.** 416 U.S. at 240 nn. 4 and 5, 94 S.Ct. 1683.

**,42.** Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 234 (1963).

**43.** Prosser, Law of Torts, § 132 at 989 (4th ed. 1971).

**44.** 161 U.S. 483 (1896). Spalding held that a Cabinet official had absolute immunity for torts arising out of his official communications.

**45.** Elsewhere in Scheuer, Spalding is quoted with apparent approval. 416 U.S. at 242 n. 7 & 246 n. 8, 94 S.Ct. 1683. Moreover, Justice White, concurring in Imbler, said that Scheuer granted only a qualified immunity, "this notwithstanding the fact that, at least with respect to high executive officers, absolute immunity from suit for damages would have applied at common law. Spalding v. Vilas, 161 U.S. 483 [16 S.Ct. 631, 40 L.Ed. 780] (1896); Alzua v. Johnson, 231 U.S. 106 [34 S.Ct. 27, 58 L.Ed. 142] (1913)." Imbler, supra 424 at 434, 96 S.Ct. at 997.