Mildred C. EIDE, Plaintiff,

v.

Richard E. TIMBERLAKE, Major, and
James D. Barnett, Defendants.

Civ. A. No. 77–2154.

United States District Court,
D. Kansas.

Sept. 22, 1980.

Eldon J. Shields and Thomas Francis Sullivan, McDonald & Dykes, Overland Park, Kan., for plaintiff.

Douglas B. Comer, Asst. U. S. Atty., U. S. Dept. of Justice, Kansas City, Kan., John Lodge Euler, Torts Branch, Civ. Div., Washington, D. C., W. Russell Welsh, U. S. Dept. of Justice, Torts Section, Civ. Div., Washington, D. C., Major J. Thomas Holloman, Dept. of the Army, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This case now comes before the court for determination of defendant Timberlake's motion for summary judgment. On October 14, 1976, plaintiff, who was curator of the Fort Leavenworth Museum, was brutally assaulted by James Barnett, a parolee of the Local Parole Unit of the United States Disciplinary Barracks at Fort Leavenworth. Barnett had been assigned to work at the Museum by defendant Timberlake, who was commander of the Local Parole Unit (LPU) at Fort Leavenworth.

In an order entered August 11, 1978, this court granted summary judgment with respect to two other named defendants, Colonel Darrell D. Kasson and Captain Kenneth L. Brady. The court found these two defendants entitled to absolute immunity from suit as that doctrine was enunciated in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). The court, however, overruled defendant Timberlake's motion for summary judgment because a question of fact remained concerning whether Timberlake met the two prerequisites for absolute immunity set out in *Barr*, 360 U.S. at 575, 79 S.Ct. at 1341. We noted that even if the two prerequisites were not met, qualified immunity may be appropriate to protect the efficient workings of government. Although Timberlake raised the defense of qualified immunity, we found that unresolved questions of fact made the granting of summary judgment inappropriate. Timberlake filed a motion for reconsideration which was denied on November 29, 1978. Timberlake filed a second motion for summary judgment on November 15, 1979, submitting that depositions and affidavits filed with the court demonstrate that he is entitled to absolute or qualified immunity as delineated in our earlier order. We again examine this troublesome and difficult area of law.

I. *Development of Law of Official Immunity.*

The controlling law on the question of immunity stems from the decision by the United States Supreme Court in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). That case involved a libel action by former employees of the Office of Rent Stabilization, an agency of the United States Government, against the Acting Director. The claim arose from a press release issued by the Acting Director indicating that he would suspend the employees for formulating a plan for the utilization of certain agency funds. In a plurality opinion the Court found absolute immunity to be available to the Acting Director as an executive officer of the federal government. As we noted in our order of August 11, 1978, Justice Harlan, joined by three other justices, set out the following reasons for affording immunity to officials of the executive branch:

It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

360 U.S. at 571, 79 S.Ct. at 1339.

We also noted in our previous order the two prerequisites to absolute immunity discussed in *Barr* : (1) The official must be exercising "the discretion which an officer of that rank must possess if the public service is to function effectively," and (2) the action complained of must be "within the outer perimeter" of the official's line of duty. 360 U.S. at 575, 79 S.Ct. at 1341. In his crucial concurring opinion, Justice Black found immunity available because the press release was neither unauthorized by an Act of Congress or a rule of government, nor plainly beyond the scope of the Acting Director's official business.

In cases following *Barr*, the Supreme Court developed the doctrine of qualified immunity to apply in situations where absolute immunity was inappropriate. Several of these cases discussed the type of immunity available to state, judicial and executive officials who had been sued pursuant to 42 U.S.C. § 1983. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Court found state judges entitled to absolute immunity when sued pursuant to § 1983, while local police officers were only entitled to a defense of "good faith and probable cause." In *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Supreme Court examined the availability of official immunity to upper echelon state executive officers sued pursuant to § 1983. The plaintiffs in *Scheuer* alleged that state officials had violated the fourteenth amendment due process rights of Kent State University students killed by the Ohio National Guard. The Court found the officials entitled to only a qualified immunity for the following reasons:

[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good–faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

416 U.S. at 247–48, 94 S.Ct. at 1692.

The *Scheuer* standard of qualified immunity was later afforded to school administrators who were sued in a § 1983 action because the Court felt a degree of immunity must be provided school board officials "if the work of the schools is to go forward." *Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). The Court noted that "the immunity must be such that public school officials understand that action taken in the good–

faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." 420 U.S. at 321, 95 S.Ct. at 1000.

The Court also found qualified immunity available to state prison officials sued under § 1983 for interference with a prisoner's mail in *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Although the defendants were alleged to have violated the prisoner's first amendment rights, at the time the infringements allegedly occurred, first amendment rights protecting the mailing privileges of state prisoners had not been established. Because state prison officials were not expected to predict the future course of constitutional law, the Court held that defendants were entitled to summary judgment. 434 U.S. at 562–63, 98 S.Ct. at 859–860.

■ The first indication that lower echelon federal employees may be entitled to some kind of qualified immunity came in *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). There the Court discussed the degree of immunity available to eight federal employees who were sued for the publishing of school reports presented to a congressional committee, which allegedly violated the plaintiffs' and the plaintiffs' children's statutory, constitutional, and common law rights to privacy. A divided panel of the United States Court of Appeals for the District of Columbia affirmed the decision of the district court dismissing the action on the ground that all the defendants were entitled to absolute immunity. 412 U.S. at 310, 93 S.Ct. at 2023. The Court found that the speech and debate clause of the Constitution afforded immunity to the committee members, the committee staff, and consultant and investigatory employees, but refused to extend this protection to the Public Printer or the Superintendent of Documents. Considering the availability of absolute immunity to these two defendants, the Court, quoting *Barr*, noted two important considerations that must be examined to determine if any official immunity will apply:

The protection of the individual citizen against pecuniary damage caused by oppressive and malicious action on the part of officials of the Federal Government; and ..., the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill–founded damage suits brought on account of action taken in the exercise of their official responsibilities.

412 U.S. at 319, 93 S.Ct. at 2028, *quoting* 360 U.S. at 565, 79 S.Ct. at 1336.

Thus, we may safely say that the rule of immunity is not fixed and invariable but instead a court must consider "whether the contributions of immunity · to effective government in particular context outweigh the perhaps recurring harm to individual citizens ...." Moreover, the *McMillan* Court emphasized that although the printing of documents and their general distribution to the public was "within the outer perimeter" of the statutory duties of the Public Printer and the Superintendent of Documents, official immunity does not automatically attach to conduct expressly or impliedly authorized by law. The Court found these two defendants entitled to a *limited* immunity noting that "the Public Printer and the Superintendent of Documents are no more free from suit in the case before us than would be a legislative aide who made copies of the materials at issue and distributed them to the public at the direction of his superiors. See *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967)." 412 U.S. at 322–24, 93 S.Ct. at 2030.

In developing the doctrine of judicial and executive immunity, the Court's basis for distinguishing between positions to be afforded qualified immunity and those to be afforded absolute immunity has not always been clear. Some positions were uniformly afforded absolute immunity, such as judges, *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (state judge), *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872) (federal judge), and prose-

cutors, *Imbler v. Patchman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (state prosecutor), *Yaselli v. Goff,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (federal prosecutor). Others were afforded absolute immunity only after the defendants were able to show that they met the two requirements of *Barr* and that the public interest in protecting government officers outweighed the harm caused to individual citizens.

In § 1983 cases wherein the Court afforded state executive officers qualified immunity instead of absolute immunity, two criteria were discernible. First, plaintiffs alleged violations of constitutional rights rather than a common law tort as in *Barr.* Second, the actions were against state rather than federal executive officers. As shown in the following discussion, the circuits disagreed on whether it was necessary to show both of these criteria before awarding a qualified rather than an absolute immunity.

In *Economou v. U.S. Department of Agriculture,* 535 F.2d 688 (2d Cir. 1976), *vacated sub nom. Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Second Circuit weighed the governmental and individual interests and found defendants were not entitled to absolute immunity but were "adequately protected by permitting them to avail themselves of the defense of qualified 'good faith, reasonable grounds' immunity of the type approved by the Supreme Court in *Scheuer* and *Wood.*" 535 F.2d at 696 (footnote omitted). The plaintiff there had sued several federal executive officials for damages concerning a dispute over an administrative proceeding conducted by the Department of Agriculture. The Second Circuit did not base its finding of qualified immunity upon the fact that plaintiff's allegations included constitutional violations, but instead appeared to treat the case as a defamation action in tort against federal executive officers. 535 F.2d at 690, 696.

In *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution, et al.,* 566 F.2d 289 (D.C.Cir.1977), *cert. denied* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160

(1978), which was also a defamation action, the Court of Appeals for the District of Columbia rejected the Second Circuit's decision in *Economou* and held that absolute rather than qualified immunity was available to the defendants. 566 F.2d at 295. The plaintiff had brought an action for libel against the Smithsonian Institution and the Chairman of the Department of Anthropology at the Smithsonian Institution's Museum of Natural History. Two points distinguished *Expeditions Unlimited* from recent § 1983 cases in which the Supreme Court found qualified immunity to be available to executive officers: (1) plaintiff here alleged a common law tort rather than a constitutional violation, and (2) the claim was against federal officers rather than state officers. 566 F.2d at 293. The court dismissed the effect of the opinion in *McMillan* as "essentially a case involving legislative immunity, under the speech and debate clause." 566 F.2d at 294.

The Supreme Court granted certiorari in *Economou* "[b]ecause of the importance of immunity doctrine to both the vindication of constitutional guarantees and the effective functioning of government." *Butz v. Economou,* 438 U.S. 478, 480–81, 98 S.Ct. 2894, 2897, 57 L.Ed.2d 895 (1978). The Court noted that plaintiff's complaint for damages "presented 10 'causes of action,' some of which purported to be state claims for damages under the United States Constitution." 438 U.S. at 482–83, 98 S.Ct. at 2898. The Court held defendants were entitled to a qualified immunity. Key to its decision was the Court's view that plaintiff alleged constitutional violations rather than claims sounding in tort.

In *Butz* the Court closely examined the application of *Barr* to the facts before it and decided that *Barr* did not control the *Butz* case because *Barr* did not involve the liability of an executive officer whose conduct was beyond the outer limits of his authority. *Barr* extended absolute immunity to an official who, although authorized to issue a press release, misused his authority by issuing a false one. In *Butz* the Court recognized that although *Barr* extended im-

munity to cover this state tort claim, "*Barr* did not purport to protect an official who has not only committed a wrong under local law, but also violated those fundamental principles of fairness embodied in the Constitution." 438 U.S. at 495, 98 S.Ct. at 2905 (footnote omitted). Thus, *Barr* continued the long–standing general rule "that a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." 438 U.S. at 489, 98 S.Ct. at 2902.

■ While *Barr* did not involve the liability of a federal officer who exceeded constitutional limits, the Court examined other cases that addressed the immunity afforded state officers sued for alleged violations of constitutional rights pursuant to 42 U.S.C. § 1983. After analyzing these decisions the Court resolved that, unless Congress specifically provided for it,

> there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by [*Bivens v. Six Unknown Federal Narcotic Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),] than is accorded state officials when sued for the identical violation under § 1983. The constitutional injuries made actionable by § 1983 are of no greater magnitude than those for which federal officials may be responsible. The pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal officials. ... Surely, *federal* officials should enjoy no greater zone of protection when they violate *federal* constitutional rules than do *state* officers.
> 438 U.S. at 500–01, 98 S.Ct. at 2907 (footnote omitted).

From what is said and held in *Butz* we are of the opinion that a federal executive officer sued for committing a common law tort will be entitled to absolute immunity if the proper criteria are shown, while one sued for violating a plaintiff's constitutional rights will at the most be entitled to qualified or limited immunity.

## II. *Timberlake's Claim of Absolute Immunity.*

■ After reviewing the development of the doctrine of official immunity, we once again examine the availability of this protection to Timberlake. Plaintiff's claims do not assert violations of constitutional rights, but instead allege common law torts. Therefore, the controlling law in this case is *Barr* rather than *Butz*. We will first consider the availability of an absolute defense of official immunity. Under *Barr* Timberlake is entitled to absolute immunity if he shows that he was exercising the discretion his position required and if he establishes that his actions were "within the outer perimeter" of his line of duty. If Timberlake is unable to establish the two prerequisites of *Barr*, he may still be entitled to qualified immunity under *McMillan* if the public interest in affording protection to this particular government official outweighs the possible harm to an individual citizen such as the plaintiff.

■ To determine whether the defendant meets the first of the two *Barr* prerequisites for absolute immunity, it is necessary to decide whether his duties required discretionary or mandatory acts. As noted by the Tenth Circuit in *Jackson v. Kelly*, 557 F.2d 735, 738 (10th Cir.1977), "[t]he key is whether the duty is mandatory or whether the act complained of involved policy–making or judgment." If a defendant's duties involve enforcement or administration of a mandatory duty at the operational level, they are not discretionary even if they require exercise of professional expertise. 557 F.2d at 737–38. Absolute immunity should be afforded executive officers who exercise discretion to enable them to perform their duties without requiring them to defend their actions in court. 557 F.2d at 736. In affirming the proposition that absolute immunity would be available only to those positions requiring the exercise of discretion, the Supreme Court in *Barr* stated:

> [T]he occasions upon which the acts of the head of an executive department will

be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibility and duties, and the wider the scope of discretion it entails. It is not the title of his office, but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to "matters committed by law to his control or supervision," *Spalding v. Vilas,* [161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)], which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.

360 U.S. at 573–74, 79 S.Ct. at 1340.

To obtain assignment to the Local Parolee Unit (LPU) at Fort Leavenworth, a prisoner in the United States Disciplinary Barracks must be designated to the status of minimum "A" custody by an Assignment Board. Minimum A custody inmates live completely outside the walls of the Disciplinary Barracks and have no barrier or restraints to escape. An inmate convicted of murder, rape, aggravated assault offenses, or sex offenses must be recommended by a Special Custody Board before he can be elevated to the status of minimum A security according to Army Regulation 190–47, 7–2(b). The recommendation of the Special Custody Board must be approved by the commandant of the Disciplinary Barracks and the post commander of Fort Leavenworth, who both have discretionary authority to accept or reject the Board's recommendation.

A change in procedure during the summer of 1976 allowed the commander of LPU to assign minimum A custody inmates to the details available. Prior to June of 1976 a recommendation that an inmate be assigned to the status of minimum A custody included a designation of the type of work in which he should be placed. The change in procedure enhanced the flexibility of assigning inmates to available details. In June of 1976 prisoners elevated to minimum A custody status were first assigned to Detail #61, LPU Overhead. After a period of observation, they were then assigned by the LPU commander to one of the details under his control. The only exception to this procedure occurred when the Assignment Board determined that a minimum A custody inmate should be assigned to a specific detail for treatment purposes.

■ Following this change in procedure, Timberlake, the commander of LPU, had "[d]iscretionary authority to assign inmates to specific details within the LPU." To be entitled to absolute immunity, Timberlake must show that this "discretionary authority" involved policy or judgmental decisions requiring the benefits of this privilege. *Jackson v. Kelly,* 557 F.2d at 738. Timberlake and Major Gasko, who preceded Timberlake as commander of LPU, stated that assignment of a minimum A custody inmate to a specific detail occurred after the inmate was elevated to minimum A custody status and assigned to Detail #61, LP Overhead. Once assigned to Detail #61, Timberlake had complete discretion to place the inmate in one of the details under his command. The available details included the commissary, the stables, the farm, and the golf course.

From the record before us it is unclear what criteria Timberlake considered in assigning an inmate to a particular detail. If an inmate was assigned to a detail just because he was available when it opened, then we are inclined to view Timberlake's actions as merely the administration of a mandatory duty and not of a policy–making nature. Timberlake states that he did not consider or even know the offense for which an inmate had been incarcerated. Nor did he make any judgment of an individual's fitness to work and live outside the confines of the Disciplinary Barracks. Even if he had complete discretion to assign an inmate to any detail under his command once the person was approved for minimum A custody status, the record suggests that the actual assignment involved no more than a routine matching of empty details with availa-

ble personnel. Although Timberlake and his predecessor say that minimum A custody inmates went through an initial evaluation period when assigned to the LP Overhead Detail #61, they give no indication of the significance of this evaluation. Timberlake provides no inkling as to how the evaluation period could or did influence his decision in assigning an inmate to a particular detail.

As we noted in our earlier order, the records in this case indicate that Barnett's elevation to minimum A custody followed the usual procedures. Barnett, who had been convicted of sodomy and attempted rape, obtained recommendations for a change to minimum A custody by the Classification Board and the Special Board, as well as concurrences in the recommendation by the commandant of the Disciplinary Barracks and by the post commander of Fort Leavenworth. Following his classification as a minimum A custody prisoner, Barnett remained in a detail normally assigned to a B custody inmate. Barnett requested that he be assigned to the Post Museum detail on September 1, 1976. On September 7, 1976, the Assignment Board approved a change to Detail #61, LP Overhead, because no openings existed on the museum detail. Barnett was temporarily assigned to commissary detail, but when an opening occurred on October 14, 1976, he was assigned to the Museum detail.

We note that the Assignment Board elevated Barnett to minimum A custody during June of 1976, but that his detail was not changed until September 1976. At that time the change in procedure was fully implemented by which the commander of LPU exercised total discretion over assignment of inmates to details under his control. Timberlake does not explain why Barnett's change in detail to LP Overhead was done by the Assignment Board rather than by himself. Timberlake asserts that he was not aware of, and that even if he had been aware of, the offense for which Barnett had been incarcerated, it would not have been inconsistent with the policies of the Disciplinary Board to assign Barnett to the Museum detail. The Assignment Board, on the other hand, knew the offense for which Barnett was incarcerated when it assigned him to LP Overhead, and knew that Barnett wanted to be assigned to the Museum and that he could be so assigned from LP Overhead.

■ The record in this case leaves unresolved questions of material fact concerning the amount of discretion exercised by Timberlake in assigning an inmate to a detail under his control. Although he asserts that he had "[d]iscretionary authority" to assign inmates to specific details once they were classified as minimum A custody status, the assignment may have been no more than a routine matching of available inmates with open details and therefore not entitled to the protection of absolute immunity. Timberlake does not show that these assignments involved considerations requiring judgmental or policy–making decisions. In fact, after Barnett was classified a minimum A inmate, the Assignment Board, rather than Timberlake, approved his assignment to LP Overhead, which later allowed his assignment to the Museum. Because factual questions involving the discretion exercised by Timberlake remain unresolved, he has not established the first prerequisite of *Barr*, which is necessary for him to be entitled to the protection of absolute immunity.

■ In our earlier order we noted that if Timberlake had violated army regulations, then he was not entitled to the protection of absolute immunity because his actions are "by definition, *not* an exercise of necessary discretion and *not* within the outer perimeter of his line of duty." Thus, in addition to a consideration of the first prerequisite set out in *Barr*, an analysis of whether Timberlake violated army regulations also brings into question the second prerequisite of *Barr*. As noted earlier in this opinion, the second prerequisite requires the act complained of be "within the outer perimeter" of the official's line of duty. 360 U.S. at 575, 79 S.Ct. at 1341.

In plaintiff's memorandum in opposition to Timberlake's motion for summary judg-

ment, she again asserts that Timberlake violated two army regulations in assigning Barnett to the Museum detail. The first regulation in question, AR 190–47, 6–7a(4)(e), prohibits prisoners from being assigned to work that permits association with women unless they are closely supervised. The second regulation in question, AR 190–47, 6–9m, requires that prisoners "who are known sexual deviates or who are considered to be potential threats as sexual offenders" be carefully examined before they are allowed to reach the status of minimum custody. This regulation further states that these inmates will not be assigned to work that could result in problems with other prisoners, females, children or animals. We will consider each of these regulations separately.

Before examining these regulations, however, we note that in her opposing memorandum to the present motion, plaintiff refers to other documents concerning minimum A custody prisoners. One document is entitled *Point Paper Concerning Assignment of Minimum A Custody Inmates* (Point Paper), which plaintiff asserts "supports AR 190–47, by defining in more elaborate detail the criteria for one to follow in elevating a prisoner to Minimum 'A' Custody; and most importantly governs the assignments to the LPU unit [a] commander must follow in placement of an inmate to a certain detail." (Plaintiff's Memorandum in Opposition filed December 27, 1979, at 3.) Attached to the Point Paper are various documents, including (A) a letter dated November 26, 1971, from the Provost Marshal General of the Department of the Army, Major General Lloyd B. Ramsey, to the Commandant of the United States Disciplinary Barracks concerning the criteria for elevating inmates to minimum "A" custody, (B) Standard Operating Procedure (SOP) dated November 11, 1971, concerning elevation and utilization of minimum "A" custody inmates, (C) SOP dated January 3, 1972, concerning custody and control of United States disciplinary inmates outside United States Disciplinary Barracks walls, but on Fort Leavenworth Reservation, (D) Annex I, Utilization Criteria for "A" Custody In-

mates Requiring Direct and Constant Supervision, and (E) Annex II, Utilization Criteria for "A" Custody Inmates Who Do Not Require Direct Constant Supervision at All Times, But Who Do Require Limited Supervision. Plaintiff argues that Timberlake acted in direct violation of these documents and of AR 190–47 by not requiring direct and constant male supervision at all times and by assigning Barnett, who had been convicted of a sex offense, to a detail in which he would have contact with women and children. The court will consider these documents as they relate to the two army regulations at issue in this case.

The first army regulation in question, AR 190–47, 6–7a(4)(e), provides:

(4) Prisoners will not be employed in duties of a personal or hazardous nature, or those which involve probable adverse criticism of the Army. *The following duties and those similar in nature are prohibited*:

\*   \*   \*   \*   \*   \*

(e) *Work which permits association with females without close supervision.* (Emphasis added.)

Standard Operating Procedures include the Museum detail among those positions that may utilize A custody inmates, but that require constant and direct male supervision. The record shows that steps were taken to assure that inmates assigned to the Museum detail were provided with close supervision as required by the regulation and procedures. The Director of Classification, John Sheridan, supervised the establishment of details and assigned Captain Kenneth Brady to discuss the possibility of establishing a detail at the Museum with the people in charge there. According to Mr. Sheridan he told Captain Brady that when he talked with someone at the Museum he should "be very, very careful about stressing the importance of supervision, stressing the importance of what 'direct' meant, because some employees seem to think that direct supervision meant being in the same building; and that's not what we had in mind at all. Direct supervision is

that the supervisor is right there all the time . . . ." (Sheridan Deposition at 26.) Captain Brady states that he discussed the Museum detail with plaintiff and advised her that civilian male supervision was required. Major Gasko, who preceded defendant Timberlake as Commander of the LPU, states that "Mrs. Eide was to be in charge of Parolee employment but she specifically agreed that male museum employees were to directly supervise the parolees."

The record discloses that plaintiff assumed the responsibility of providing male supervision for inmates assigned to the Museum detail and understood the importance of complying with that requirement. In her deposition plaintiff states that she was never alone in the Museum building with an inmate. If the civilian male supervisor, Richard J. Podsiadlo, could not be present in the Museum, plaintiff states that an enlisted man was sent to the building when an inmate was on detail. She notes that she "would have violated the very principle of [the inmates'] employment if [she] had not had someone there." Although plaintiff, as Curator, was in charge of activities at the Museum, a male civilian employee directly supervised the assignment of work to inmates. According to plaintiff, she would give the work program to Mr. Podsiadlo, who divided the program between himself and the inmate. Plaintiff resolved any questions or problems that arose in completing the work program. On Barnett's first day at the Museum he was told that Mr. Podsiadlo would be his direct supervisor.

Finally, the court is of the opinion that any question about a male supervisor being provided for inmates assigned to the Museum work detail is resolved by plaintiff's memo of April 16, 1975, to Captain Brady. In that memo plaintiff states that "[a]ll work is to be performed at the direction and under the supervision of a male supervisor." Such direct male supervision would be in compliance with the requirements of AR 190–47, 6–7a(4)(e), the supporting SOP of December 11, 1971, and Annex I. Therefore, we can only conclude that Timberlake did not violate AR 190–47, 6–7a(4)(e) or procedures or guidelines used to implement it.

The court must still determine whether defendant violated the second regulation. This regulation, AR 190–47, 6–9m, provides:

Persons who are known sexual deviates or who are considered to be potential threats as sexual offenders will be carefully evaluated prior to minimum custody grades. *Such prisoners will not be assigned to work that could result in problems with other prisoners, females, children or animals.* (Emphasis added.)

Apparently to assist in implementing this regulation, the Point Paper includes a letter of November 26, 1971, from the Provost Marshal General setting out the criteria to be used to elevate prisoners to A custody. This letter provides that prisoners convicted of "murder, rape, serious assaultive offenses, and sex offenses" must first be positively recommended by a special custody board, the composition of which is specifically outlined, and then must be approved by the commandant of the Disciplinary Barracks and the commander of the host installation. There is no question that this procedure was implemented at Fort Leavenworth and that it was followed in the elevation of Barnett to minimum A custody status.

Individuals associated with the Special Custody Board at Fort Leavenworth considered the purpose of the board to be to determine whether an inmate being considered for minimum A custody constituted a potential threat to people on the post. This special determination was made for inmates who were "known sexual deviates" or "considered to be potential threats as sexual offenders" after the Assignment Board had found these inmates fit to work and live outside the Disciplinary Barracks. Timberlake understood that these boards considered an inmate's character and fitness, including his ability to work around women, children, or animals. Because the assignment and special custody boards passed upon an inmate's suitability to work and live outside the Disciplinary Barracks and because Timberlake was not made

aware of the offense for which a prisoner was incarcerated, Timberlake states that an inmate assigned to the LPU could be placed on any of the details under his control. According to Timberlake, many of the LPU details, "including the Commissary, the Stables, the Engineer (both Civil and Military), the Barber Shop and the Museum, involved contact with women or children." It would appear from the overall record that all LPU details involved a possibility of contact with civilians, including women and children.

The court is of the opinion that the procedures outlined in the Point Paper were complied with in this case. Barnett was recommended to minimum A custody by both the Assignment Board and the Special Custody Board. In addition, his elevation was approved by the commandant of the United States Disciplinary Barracks and the commander of Fort Leavenworth. Because, as plaintiff concedes, the Point Paper "governs the assignments that the LPU Commander must follow in placement of an inmate to a certain work detail," compliance with these procedures necessarily means that the regulations were not violated. Therefore, we find that Timberlake's assignment of Barnett to the Museum detail did not violate AR 190–47, 6–9m because Barnett's elevation to minimum A custody and his assignment to that detail complied with the procedures in effect at that time.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is to be rendered if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Timberlake has not established as a matter of law that his decision to assign minimum A custody inmates to particular details involves the exercise of discretion contemplated by the first prerequisite of *Barr.* Indeed the record suggests that these decisions consisted of no more than routine assignments of available inmates to open details. Because a question of fact remains on this point, Timberlake's motion for summary judgment must be denied.

### III. *Timberlake's Claim of Qualified Immunity.*

Having found that Timberlake's motion for summary judgment based on absolute immunity should be denied, the court must still consider whether Timberlake is entitled to qualified immunity as a matter of law. As indicated earlier in this opinion, the development of limited or qualified immunity has mainly occurred in the context of § 1983 cases. The first recognition by the Supreme Court that a limited immunity would be available to federal executive officers occurred in *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). The Court held that two of the defendants, the Public Printer and the Superintendent of Documents, were not entitled to absolute immunity provided by the Speech and Debate Clause of the United States Constitution, but were instead entitled only to a limited immunity. 412 U.S. at 324, 93 S.Ct. at 2030. In reaching its conclusion, the Court stressed the need to balance the harm to individual citizens caused by the action of federal executive officers with public interest in shielding such officers from the harassment and hazards of ill–founded damage suits. 412 U.S. at 319, 93 S.Ct. at 2018.

In *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), the Court emphasized that the basis for affording qualified immunity to acts of executive officers performed in the course of official conduct depends upon "the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good–faith belief." In a similar vein, the Tenth Circuit in *Smith v. Losee*, 485 F.2d 334, 340 (10th Cir.1973), described how a qualified immunity defense could be shown:

> [A qualified privilege] may be asserted as a matter of defense, but it is "qualified" in that proof to support the defense is required. This proof is often lack of malice, or good faith, or some similar showing of good and proper cause for the act complained of. If such a defense can be established during the course of the trial,

the jury or judge must then find for the defendant. This qualified privilege thus does not meet that element of the purpose of the [official immunity] rule that the official should not be required to expend time in the defense of litigation brought against him, but it is in accord with the other elements.

*Id.* at 342.

In *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975), a suit under § 1983 alleging violation of constitutional rights, the Supreme Court held that school board members were entitled to assert a defense of qualified immunity, but a member would not prevail with that defense "if he knew or reasonably should have known that the action he took within his sphere of responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student."

We recognize that the instant case involves a common law tort rather than the alleged violation of a constitutional right. Nevertheless, we hold that the standard articulated in *Wood* is applicable to the facts here with respect to Timberlake's defense of qualified immunity. This presupposes that the trier of fact will not find Timberlake entitled to absolute immunity.

The Tenth Circuit in *Smith* made it plain that ordinarily the question of qualified immunity is one to be determined by the judge or jury following trial. The cases cited by Timberlake for the proposition that issues of qualified immunity can be dealt with by way of summary judgment, involved defendants' knowledge that a given act was unconstitutional. *E. g., Procunier v. Navarette,* 434 U.S. 555, 565–66, 98 S.Ct. 855, 861–862, 54 L.Ed.2d 664 (1978). They are distinguishable from the instant case because a court, rather than a jury, is often in a better position to determine whether an act was known to be unconstitutional at the time it was performed. Because we conclude that Timberlake's claim of qualified immunity is more appropriately left to the trier of fact and cannot be decided as a matter of law, his motion for summary judgment must also be denied on that ground. Accordingly,

IT IS THEREFORE ORDERED that defendant Timberlake's motion for summary judgment be and hereby is overruled.